UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
————————————————————————————X

THOMAS M. LONGI and DIANNE H. LONGI,

               Plaintiffs,

      -against-

**OPINION & ORDER**
**CV-02-5821 (SJF)(JO)**

THE STATE OF NEW YORK,
     New York State Governor George Pataki,
     New York State Police, New York State
     Department of Taxation and Finance,
     New York State Division of Corporations,
     New York State Department of State,
     New York State Supreme Court Justice
     Marvin Segal, Nassau County New York
     State Supreme Court, New York State
     Supreme Court Justice Paul Baisley,
     Suffolk County New York State Supreme Court,
     New York State Department of Motor Vehicles,
     New York State Titles Bureau, New York State
     Insurance Department, New York State
     Banking Department, New York State
     Department of Consumer Affairs,
     New York State Attorney General Eliot Spitzer,
THE COUNTY OF SUFFOLK,
     Suffolk County District Attorney Thomas Spota,
     Suffolk County Sheriff's Department,
     Suffolk County Clerk Edward Romaine,
     Suffolk County Police Internal Affairs Division,
     Suffolk County Police Department Fifth Precinct,
     Suffolk County Police Department Third Precinct,
     Suffolk County Legislature,
     Suffolk County Department of Consumer Affairs,
     Suffolk County Detective Calabrese,
     Suffolk County Detective Gardner,
     Suffolk County Executive Robert Gaffney,
THE TOWN OF BROOKHAVEN,
     Civil Code Enforcement,
THE FEDERAL BUREAU OF INVESTIGATION,
     Agent Peter Grupe, Agent Joseph Fanning, Sr.,
     Agent Joseph Fanning, Jr.
THE TOWN OF RIVERHEAD,

Riverhead Community Development Agency,
Town Council, Riverhead Town Supervisor,
Richard Bowman, Andrea Lohneise,
Vincent Villella, James Stark,
COMPLETE RV SALES AND SERVICE,
TAG MOTORS & RV SALES AND SERVICE,
GRAND AM RV SALES AND SERVICE,
SPECIALIZED INSURANCE, WRENN INSURANCE,
GREAT AMERICAN INSURANCE COMPANY,
KEY BANK OF NEW YORK,
George Gomes, Richard Rossi, John Langdon,
Nancy Langdon, Douglas Jones,
NORTH FORK BANK,
John Kanas,
FLEETWOOD CREDIT CORP.,
MBA INSURANCE, VERIZON NEW YORK INC.,
TEAMSTERS LOCAL 817,
Local Vice-President Thomas O'Donnell, Jr.,
Local President Thomas O'Donnell, Sr.,
FELIX GRUCCI, AT&T, SAFARI MOTOR COACH
CORPORATION, REPUBLIC WESTERN
INSURANCE COMPANY,
FIRST INDUSTRIAL REALTY TRUST,
Jan Burman, Richard Cohen,
GRUBB & ELLIS,
Richard Seiler,
TWOMEY, LATHAM, SHANE AND KELLEY,
Chris Kelly,
ISLAND SHORE REALTY, and
Jack O'Connor,

                              Defendants.
_____X

FEUERSTEIN, J.

On November 1, 2002, plaintiffs Thomas Longi (Thomas) and Dianne Longi (Dianne)

(collectively, plaintiffs) commenced this action pursuant to, *inter alia*, 42 U.S.C. § 1983 alleging

violations of (1) their Fifth and Fourteenth Amendment rights; (2) 18 U.S.C. Chapter I, §§ 2, 3,

4; (3) the "Intellectual Property Act"; (4) the Privacy Act of 1974; (5) the "Corrupt Practices

Act"; (6) the Truth in Lending Act (TILA); (7) the "Fair Collections Practices Act"; and (8) the Freedom of Information Act of 1966 (FOIA). Certain of the above-named defendants now move pursuant to, *inter alia*, Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint. For the reasons set forth herein, the motions are granted in part and denied in part.

I.    BACKGROUND

      A.    Factual Background[1]

            1.    First Cause of Action

                  a.    The Fanning Incident

Thomas alleges that sometime prior to August 1971, his mother Rose Longi (Rose), a real estate developer, applied to the New York State Wagering Commission for a license to develop a race track on certain property formerly owned by Grumman located in Riverhead, New York (the Grumman property). (Amended Complaint [Compl.] ¶¶ 13[a], 16, 18). According to Thomas, on August 1, 1971 or August 10, 1971[2], two agents from defendant the Federal Bureau of Investigation (FBI), one of whom was defendant Joseph Fanning Senior (Fanning Sr.), came to his house "as a prerequisite" to granting the license. (Compl. ¶ 16). He alleges that at some point Fanning Sr. stated that he would "see to it" that Rose was not granted a license, and that she would not be permitted to use or to build on the Grumman property because of her

_____

[1] As is required on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the factual allegations in the complaint, though disputed by defendants, are accepted to be true for purposes of this motion, and all reasonable inferences are drawn therefrom in favor of plaintiffs. They do not constitute findings of fact by this court.

[2] There is a discrepancy in the amended complaint.

"relations" (hereinafter, the Fanning incident). (Compl. ¶ 16).

Thomas alleges that in October and November 1971, he received two letters from Fordham University (the University), which he had attended as a "special admission" student since his junior cadet year at La Salle Military Academy (La Salle), indicating that his "official status" at the University would be in jeopardy if he did not provide it with a complete copy of his official transcript from La Salle. (Compl. ¶¶ 20[b]). He interpreted the letters to mean that he was not permitted to proceed or finish his education at the University or to return to La Salle to complete his final year because his academic seat and cadet military rank had been given to another cadet. (Compl. ¶ 20[b]). He alleges that the letters were sent after the FBI, provoked by the Fanning incident, requested that a "special audit" be conducted of his admissions records for both the University and La Salle. (Compl. ¶ 21). According to Thomas, the FBI deliberately opened and created a file on him in order to destroy his academic career and future. (Compl. ¶ 21).

Thomas alleges that he believed the Fanning incident to be "extremely traumatic," and that it resulted in the loss of his "educational future," his career, his love (of medicine), and his inheritance in the Grumman property. (Compl. ¶¶ 13[a], 17-18, 20[a]). This branch of Thomas's first cause of action seeks to allege violations of his Fifth and Fourteenth Amendment rights and $5 billion in damages. (Compl. ¶¶ 33, 35).

        b.     Failures to Investigate or Inadequate or "Suppressed" Investigations

Plaintiffs allege that their business, A*Longi Productions Inc., which was incorporated on

March 26 1996 to, *inter alia*, provide motor homes, trailers and other production services to individuals and entities in the entertainment business (Comp., ¶ 31), was used without their knowledge to commit bank and insurance fraud, "involving a 'deliberately set fire' at [defendant] Tag Motors and RV Sales and Service [Tag Motors]." (Compl., ¶ 22). According to plaintiffs, the investigation of the fire was "suppressed" by defendants Suffolk County Police Department Fifth Precinct (the SCPD Fifth Precinct), Douglas Jones (Jones) and Detectives Gardner and Calabrese, who were assigned by the Suffolk County District Attorneys in February 2001 and September 2002 to investigate the fire. (Compl., ¶ 22). Plaintiffs allege that the "suppression" of the investigation into the purported insurance fraud violated Thomas's due process and equal protection rights under the Fifth and Fourteenth Amendments, respectively. (Compl., ¶ 23). Plaintiffs also allege that "the agency defendants named in the Original Complaint,"[3] are guilty of criminal conduct pursuant to Title 18, Chapter 1 of the United States Code for their "suppression" of the investigations into, *inter alia*, the insurance fraud and arson. (Compl., ¶ 25).

Plaintiffs further allege that an investigation into the alleged theft of Thomas's "Hollywood Plan" for the Grumman property, infra, was "suppressed" by defendant Joseph Fanning Jr. (Fanning Jr.), of the FBI and that "each law enforcement agency defendant" took part in, or profited from, the fraud committed by the theft of Thomas's "Hollywood Plan" and failed to do their job, in violation of 18 U.S.C., Chapter I, § 4. (Compl. ¶¶ 20[a], 24).

---

[3] The only defendant named in the original complaint which can be said to be an "agency defendant" is the FBI.

c.    Dianne's Claim

Dianne alleges that since 1976, when she first met and married Thomas, she has had to "live with the anguish involved with the loss of [Thomas's] education and career, and has had to further suffer because she shared [the Longi name], which meant to her that literally anyone could rob or defraud her, with or without the intervention of local law enforcement." (Compl. ¶ 27). According to Dianne, as a result, she lost her savings, retirement fund and credit, and suffered a gradual deterioration of her health. (Compl. ¶ 27). Further, Dianne maintains that she "has been forced to maintain her stressful employment position as a 'production coordinator' for the American Institute of Physics," since she could not retire following the loss of plaintiffs' joint business venture, and the theft of her own funds and credit. (Compl. ¶ 27). According to Dianne, "the agency defendants" violated her due process and equal protection rights under the Fifth and Fourteenth Amendments. (Compl. ¶ 27).

2.    Second Cause of Action

a.    Claims Relating to Plaintiffs' Accounts at North Fork Bank

Plaintiffs allege that in April 1995, they responded to advertisements from defendant North Forth Bank (North Fork) to obtain a home equity line of credit secured through a second mortgage on their home in the amount of $35,000 to start their new business venture. (Compl. ¶¶ 36, 38). In addition, they opened a new service account at North Fork, from which the monthly interest installments on the loan were automatically deducted. (Compl. ¶ 38). According to plaintiffs, they were "to be guaranteed fraud and consumer protection for ANY purchase they made towards their new business out of the accounts held at North Fork Bank." (Compl. ¶ 38).

6

Plaintiffs allege that at the closing on the home equity line of credit loan, North Fork insisted that they sign two separate loan documents, claiming that they were identical, but refused to give plaintiffs a copy of the second document. (Compl. ¶ 39).

Plaintiffs allege that defendants Fleetwood Credit Corp. (Fleetwood Credit), Grand Am RV Sales and Service (Grand Am), and Complete RV Sales and Service (Complete RV), attempted to defraud them of $30,000 of equity in a 1989 motor home by fraudulently attempting to buy the bank note which secured the motor home from Fleetwood Credit. (Compl. ¶¶ 40, 86). According to plaintiffs, they promptly reported the fraud to North Fork. (Compl. ¶ 40). They maintain that as a result of the fraud, they "were finding it increasingly difficult to get to North Fork Bank to make cash deposits into the service account for their home equity line of credit, as they had to watch their motor home and their investment in the motor home." (Compl. ¶ 40).

Plaintiffs also allege that on or about April 1995, Grand Am induced them to purchase a motor home, under the false pretense that it would supply them with rental customers; refused to disclose the name of the lender who had approved them for credit after they demanded written assurances of the rentals; and tried to prevent the sale of their first business vehicle. (Compl. ¶ 85). According to plaintiffs, Grand Am had an unwritten agreement with Complete RV and Tag Motors. (Compl. ¶ 85).

Plaintiffs allege that in December 1995, they transferred their service account to their "regular" checking account at North Fork, into which their paychecks were directly deposited by their employers, and were denied an original copy of the transfer agreement, but assumed that the monthly payments on their home equity line of credit were automatically deducted from their checking account. (Compl. ¶¶ 41-42).

In April 1996, shortly after reporting fraud on their credit cards, plaintiffs opened their first business account at North Fork. (Compl. ¶ 44). According to plaintiffs, North Fork again demanded that they sign two copies of the business account forms and corporate resolutions, and recommended the name of a New Jersey company that supplied new businesses with "front line merchant credit card accounts." (Compl. ¶¶ 44-45). According to plaintiffs, after paying the New Jersey company's fees and sending it the signed documents and blank checks, the company claimed that it had lost the documents and blank checks. (Compl. ¶ 45). Plaintiffs maintain that they immediately reported this incident to North Fork, which then recommended a second company, for which they were required to complete a second set of documents. (Compl. ¶ 45).

Plaintiffs allege that in September 1997, large sums of money were missing from the A*Longi Productions business account at North Fork. (Compl. ¶ 47). According to plaintiffs, North Fork stated that either (1) one of their clients' checks bounced, or (2) one of the plaintiffs removed money from the account without the knowledge of the other. (Compl. ¶ 47). Plaintiffs maintain that the funds "magically reappeared" a few days later without any explanation. (Compl. ¶ 47).

Plaintiffs further allege that between September 1997 and December 1997, they continued to find money missing from their North Fork accounts. (Compl. ¶ 52). In addition, plaintiffs allege that "throughout 1998 and extending well into the year 2000," funds were temporarily missing from their North Fork accounts and that North Fork released or used their credit information and sent credit rejection notices to plaintiffs even though they had not applied for additional money. (Compl., ¶ 58).

According to plaintiffs, the incidents with North Fork can be explained by a "witnessed

meeting" that occurred between defendant Richard Bowman (Bowman), a Town of Riverhead official, and defendant John Kanas (Kanas), the President of North Fork. (Compl., p. 42, ¶ 59). Plaintiffs allege that during that meeting, Bowman asked Kanas to "get any information he could" about A* Longi Productions and its clients so that the Town of Riverhead could contact the clients directly about the plans for the Grumman property. (Compl., p. 42, ¶ 59).

Plaintiffs allege that at the end of August 2000, North Fork bounced a check from A* Longi Productions to an equipment supplier, notwithstanding that a "very large" check had recently been deposited from a client into the business account. (Compl., p. 42, ¶ 60). According to plaintiffs, after this incident they discovered that there had been an "on-going error" since April 1996, in which North Fork was taking money out of the business account to repay their home equity line of credit. (Compl., p. 42, ¶¶ 60-61). In addition, plaintiffs maintain that North Fork began taking money out of a second business account from 1998 until August 2000. (Compl., p. 43, ¶ 60). Moreover, plaintiffs allege that the deductions from the business accounts were not done "cleanly," because North Fork would allow the home equity line of credit to fall delinquent by several months, report the delinquencies to credit reporting agencies without notice to plaintiffs, transfer entire deposits from the business accounts into plaintiffs' personal accounts, then deduct several months' payments at once and return the remainder into the business accounts. (Compl., p. 43, ¶ 61). According to plaintiffs, this practice permitted creditors to perceive A*Longi Productions as having no working capitol and ruined plaintiffs' personal credit rating. (Compl., pp. 43-44, ¶ 61). In addition, plaintiffs contend that North Fork did not honor any of its fraud guarantees. (Compl., p. 44, ¶ 61). Plaintiffs further allege the North Fork conspired with other defendants to destroy their credit, income, reputation, business prospects,

and business. (Compl., p. 44, ¶ 61).

Moreover, plaintiffs contend that North Fork threatened Dianne with the loss of her home if she did not agree to continue paying the home equity line of credit, and then closed and refused to reopen the business accounts and refused to return the money it had taken from plaintiffs' accounts. (Compl. ¶ 66).


        b.       Failure to Investigate

Plaintiffs allege that in September 2000, they reported the entire matter with North Fork to defendant the New York State Banking Commission, which failed to fully investigate the matter. (Compl., ¶ 62). In addition, plaintiffs allege that in February 2001, they brought the matter to the attention of Gardner, Calabrese, and the Suffolk County District Attorney, who also failed to investigate. (Compl., ¶ 62). Plaintiffs further allege that when they complained again to Gardner, Calabrese and the Suffolk County District Attorney in September 2002, they were threatened by Gardner and Calabrese. (Compl., ¶ 62). According to plaintiffs, the Suffolk County District Attorney Office is "suppressing evidence of a capitol crime perpetrated against [them] * * * as [it] is directly involved in the thefts, and further suppressed evidence of [the arson in 1996]." (Compl., ¶ 64).

Plaintiffs allege that "just after" they complained to the Suffolk County District Attorney, they complained to the FBI, Fanning Jr. and defendant Peter Grupe (Grupe) in April 2000 [sic], who also failed to investigate. (Compl., ¶ 63a).

c.    Lien on Grumman Property

Plaintiffs allege that defendant Suffolk County Clerk Edward Romaine (Romaine),

instructed them to file a mechanic's lien against the Town of Riverhead (Community

Development Agency) upon the Grumman property. (Compl., ¶ 63b). According to Exhibit V of

the amended complaint, A*Longi Productions filed the lien in the amount of $130 million on

December 20, 2001 based upon its "provision of reuse strategy, business plan, architec[tural]

renderings, scientific inventions, and bid and proposal for the [Grumman Property]" during the

period from April 10, 1996 through July 17, 2000.

According to plaintiffs, in November 2001 the Town of Riverhead sold the industrial core

of the Grumman property to defendant Jan Burman, of First Industrial Realty Trust (First

Industrial), notwithstanding that their lien was never contested or litigated. (Compl., ¶ 65). In

addition, according to plaintiffs, defendant the County of Suffolk announced that it intended to

sell the remaining portions of the Grumman property in September 2002 without compensating

them in any way. (Compl., ¶ 65). According to plaintiffs, this conduct violated their due process

and equal protection rights under the Fifth and Fourteenth Amendments.


d.    Theft of "Hollywood Plan"

Plaintiffs allege that twenty-five years after the Fanning incident, Thomas devised the

"single 'best' reuse plan" for the Grumman property, the creation of "another East Coast

'Hollywood' between Manhattan and the Hamptons." (hereinafter the Hollywood plan). (Compl.

¶¶ 17, 19, 22, 46). Plaintiffs allege that in September 1997, defendant James Stark (Stark)

arranged a meeting between Thomas and defendants Jack O'Connor (O'Connor) of Island Shore

Realty (Island Realty) and Richard Seiler (Seiler) of Grubb & Ellis. (Compl., ¶¶ 47-48). According to plaintiffs, Thomas was told at the meeting that the Town of Riverhead wanted to do business only with him with respect to the Grumman property, that he would have to present them with a letter of credit in the amount of twenty million dollars to lease the property, and that upon presentation of the letter of credit, the Town of Riverhead would close on the property within thirty days. (Compl., ¶ 48). In addition, plaintiffs allege that O'Connor told Thomas at the meeting that he had arranged to have the FBI follow Thomas.

Plaintiffs allege that Thomas managed to secure the necessary letter of credit the following morning, but when Thomas called O'Connor that same day he was told that the Town of Riverhead had changed its mind. (Compl. ¶¶ 51-52). Plaintiffs allege that shortly thereafter, Thomas sent a letter to the Town of Riverhead accusing it, Island Realty and Grubb & Ellis of, *inter alia*, "bid rigging" and "theft of intellectual property." (Compl., ¶ 53).

According to plaintiffs, in February 1998, Thomas met with defendants Vincent Villella (Villella), Bowman and Andre Lohneise (Lohneise), and with Robert Kozakowitz, regarding his "Hollywood Plan." (Compl., ¶ 54). Plaintiffs allege that at the meeting, Villella, *inter alia*, suggested that First Industrial, which had been given the option to purchase the "industrial core" of the Grumman property, would likely lose their option to buy the property and that if Thomas gave First Industrial his plans and blueprints relating to the "Hollywood Plan," First Industrial would lease the entire industrial core to him. (Compl., ¶ 54g). According to plaintiffs, Thomas reluctantly agreed and a meeting was scheduled between him, defendant Richard Cohen (Cohen) and several other representatives of First Industrial, O'Connor and Bowman. (Compl., ¶ 54g).

Plaintiffs allege that, as agreed, Thomas brought his "plans, blueprints, financing

12

strategies, and other documents" to the meeting. (Compl., ¶55). According to plaintiffs, First Industrial's representatives took his plans and told him they would let him know. (Compl., ¶ 55). Plaintiffs allege that one day later, Thomas was contacted by defendant Twomey, Latham, Shane and Kelly (Twomey Latham) regarding a contract of sale and an August 1998 closing date. (Compl., ¶ 55). According to plaintiffs, at the closing, Thomas was tricked by representatives from the Town of Riverhead and Grubb & Ellis, and by O'Connor and Chris Kelly, of Twomey Latham, into signing a document releasing those entities from any civil claims by him. (Compl. ¶ 56). Plaintiffs allege that Thomas subsequently wrote a letter of complaint to, *inter alia*, defendant Governor George Pataki (Governor Pataki). (Compl., ¶ 57).

Plaintiffs allege that in November 2001, the Town of Riverhead, Stark, Villella, Bowman, Lohneise and Kozakowitz, gave or sold the "Hollywood Plan" to Burman. (Compl. ¶¶ 22, 48-53, 65). Plaintiffs further allege that Burman used Thomas's strategy, plans, and blueprints to purchase "Grumman's former 525-acre industrial core." (Compl. ¶ 22). Plaintiffs claim that the alleged theft of Thomas's "Hollywood Plan" violated his due process and equal protection rights under the Fifth and Fourteenth Amendments, respectively.

### 3. Third Cause of Action

#### a. Tampering with Telephone Lines

Plaintiffs allege that following a burglary on their property on November 10, 1995, they started to receive telephone bills from both local service carriers (NYNEX, now defendant Verizon New York Inc. [Verizon]) and long distance service carriers (defendant AT&T) for calls they did not make. (Compl. ¶ 68). According to plaintiffs, both companies stated that they

would investigate the claim, but neither company ever reported the results of any investigation to them. (Compl. ¶ 69). In addition, plaintiffs allege that the problem escalated from February to May 1996, when family members and clients reported that they could not reach plaintiffs by telephone. (Compl. ¶ 69). Moreover, according to plaintiffs, although they complained of the problem to the SCPD Fifth Precinct, the police were unable to investigate until Verizon and AT&T completed their investigations, which never occurred. (Compl. ¶¶ 69, 72). Plaintiffs maintain that the tampering of their telephone lines prevented clients from contacting them by telephone and impeded access to their Internet site. (Compl. ¶ 71).

Plaintiffs further allege that in June 1997, they hired a private investigator who reported that the telephone service problems were "originating" from representatives of AT&T and Verizon, as well as from members of defendant Teamsters Local 817 (Teamsters) and organized crime. (Compl. ¶ 70). According to plaintiffs, their telephone lines had been illegally "spliced" to misdirect or redirect calls, resulting in a loss of almost 90% of their customers; they were "slammed"[4] by AT&T when they attempted to change their long distance provider; their toll-free calls were being redirected; and their two toll-free numbers were being advertised by other companies. (Compl. ¶¶ 70[c] and 71).

Plaintiffs also contend that the New York State Attorney General's Office advised them in August 2000 that it would investigate the problem, but failed to document the completion of its investigation into their complaints. (Compl. ¶ 72).

---

[4] "Slamming" is the practice of a telephone company in changing a consumer's telephone service without permission.

b.    Ownership of Motor Homes

i.    Insurance

Plaintiffs allege that between April 1996 and "well into" 1997, defendants Great

American Insurance Company (Great American) and Richard Rossi (Rossi) refused to send them

copies of their insurance policy and proof of coverage, as well as the title and registration to their

Safari motor home, as a result of which they were forced to turn away potential lessees. (Compl.

¶¶ 75, 91-92). They further allege that Rossi and the owner of Tag Motors later admitted that the

insurance policy was deliberately being sent to Tag Motors, "to hide the fact that the Plaintiffs

were paying nearly $1000.00 per month to insure their vehicles AND the vehicles belonging [sic]

to Tag Motors." (Compl. ¶¶ 75, 91).

Plaintiffs allege that in April 1997, defendant George Gomes (Gomes) proposed that if

plaintiffs financed another motor home at Tag Motors through defendant Key Bank of New York

(Key Bank), he and Rossi would place title and registration to both motor homes in plaintiffs'

names. (Compl. ¶ 92). According to plaintiffs, Key Bank knowingly profited from the fraud.

(Compl. ¶ 93).

Plaintiffs further allege that on or about September 1997, they attempted to change

insurance carriers to defendants MBA Insurance (MBA) and Republic Western Insurance

Companies (Republic Western), but discovered in July 2001 that those were the same companies

as Great American. (Compl. ¶ 76).

In addition, plaintiffs allege that for a thirteen-month period beginning September 1997,

they suffered "almost total losses" to all three of their motor homes as a result of an accidental

fire and a theft, but that Republic Western refused to honor their insurance claims, as a result of

15

which they were forced to operate their business with severely damaged motor homes. (Compl. ¶ 76). This incident was the basis of a federal lawsuit, which was settled[5]. (Compl. ¶ 76). Plaintiffs allege that the settlement amount was "less than the cost to fix just one of the motor homes," and that the two other motor homes could not be fixed. (Compl. ¶ 76). According to plaintiffs, Republic Western and Great American are related, they did not discover the purported relationship until after the settlement and, therefore, the settlement was based upon fraud. (Compl. ¶ 77). Accordingly, plaintiffs claim that they "decided to name the first and the second insurance company, and Richard Rossi [the insurance broker] in this action." (Compl. ¶ 77).

Plaintiffs allege that the FBI did not investigate or prosecute the parties purportedly involved in the insurance matter. (Compl., ¶ 78).

    ii.    Repairs to Motor Homes

Plaintiffs maintain that Tag Motors and defendant Safari Motor Coach Corporation (Safari Motor Coach) refused to perform warrantied repairs on two of the motor homes that Tag Motors sold to them which, according to plaintiffs, were damaged as a result of being stored in an open lot for two to three years before they were sold. (Compl. ¶ 79). Plaintiffs further

---

[5] Republic Western has attached to its motion the complaint, so-ordered stipulation of dismissal and release relating to an action commenced by plaintiffs in the Supreme Court of the State of New York, County of Suffolk on May 25, 2000, entitled <u>Longi v. Republic Western Insurance Company</u>, index no. 00-13057, and subsequently removed to this Court and assigned docket number CV-3644, of which I will take judicial notice. In that action, plaintiffs alleged that Republic Western owed them money pursuant to certain insurance policies issued to A*Longi Productions, Inc. On or about June 29, 2001, the parties to that lawsuit settled the matter for the amount of $62,000.00 and the Court so-ordered the parties stipulation of dismissal with prejudice on July 23, 2001. In addition, on June 27, 2001, plaintiffs signed a contract releasing Republic Western from all claims relating to that action.

contend that Safari Motor Coach and the manufacturer of the Holiday Rambler (which is not a named defendant) refused to authorize the repairs or send them the necessary parts so they could have the vehicles repaired.  (Compl. ¶ 79).

### c.    Dissolution of A* Longi Productions, Inc.

Plaintiffs allege that defendant the State of New York (the State) wrongfully dissolved A* Longi Productions, Inc. and reneged on its agreement to reactivate the company.  (Compl. ¶ 81).  According to plaintiffs, the State is "playing 'Russian Roulette' with the sale of the Plaintiff's [sic] company name, in an attempt to see the plaintiffs lose their company's franchise rights, and therefore their civil claims against the State Defendant before trial in this matter."  (Compl. ¶ 81).  Plaintiffs contend that the dissolution of the company resulted in the loss of "millions of dollars" in civil claims and liens belonging to the company without due process, in violation of the Fifth Amendment.  (Compl. ¶ 82).  Moreover, plaintiffs allege that "both the named agency and non-agency Defendants named in this third cause of action " failed to intervene or resolve this issue, in violation of the Fifth and Fourteenth Amendments.  (Compl. ¶ 82).

### d.    Bankruptcy Action

Plaintiffs claim that each of the "agency defendants" have interfered with their rights under Title 11 of the United States Code.  (Compl. ¶ 83).  According to plaintiffs, their bankruptcy proceeding "is being conducted in a way that is unlike any bankruptcy proceeding any American as [sic] ever heard of," as a result of which they have been effectively denied any bankruptcy protections at all.  (Compl. ¶ 83).  In addition, plaintiffs contend that they are required

to proceed with depositions in "the State actions," even though "they should have the right to 'automatic stay.'" (Compl. ¶ 83).

### 4.     Fourth Cause of Action

#### a.     Financing of Motor Homes

Plaintiffs allege that in April 1995, Grand Am secured credit approval so that plaintiffs could purchase a 1995 Fleetwood Bounder Motor Home, "under the pretense that [Grand Am] would supply the Plaintiffs with rental customers." (Compl., ¶ 85). According to plaintiffs, when the deal fell through, Grand Am refused to disclose the name of the lender who had approved them for credit so they could do business elsewhere, in purported violation of the Truth in Lending Act. (Compl., ¶ 85). Plaintiffs further allege that Grand Am then called the original owner of their first business vehicle in an attempt to prevent the sale. (Compl., ¶ 85). According to plaintiffs, they later discovered that Grand Am had an agreement with Complete RV and Tag Motors. (Compl., ¶¶ 85-86).

Plaintiffs allege that Fleetwood Credit allowed them to assume a $29,000 note on their first motor home, then deliberately filed the wrong lien paperwork with defendant the New York State Department of Motor Vehicles (DMV). (Compl. ¶ 87). According to plaintiffs, after they made payments for four months, Fleetwood Credit attempted to repossess their vehicle for a breach of the loan agreement. (Compl. ¶87). Plaintiffs maintain that when that plan failed, Fleetwood Credit demanded that they surrender the vehicle to Grand Am or Complete RV. (Compl. ¶ 87). According to plaintiffs, when they refused, Fleetwood Credit "haunted [them] night and day" to send it the original title until the ten-year note was paid off. (Compl. ¶ 87).

18

Plaintiffs maintain that when that plan also failed, Fleetwood Credit fabricated a new account claiming that plaintiffs had bought the vehicle eleven months after the actual date of sale and attempted to convince the DMV to issue it the title to the vehicle. (Compl. ¶ 87).

Plaintiffs allege that after they made timely payments for four years, defendant The New York State Titles Bureau (the Titles Bureau) issued a second title naming Fleetwood Credit as a lienholder, without requiring any signed forms or recovering the original title from plaintiffs. (Compl. ¶ 87).

Plaintiffs further allege that six years later, in 2001, following their refusal to acknowledge Fleetwood Credit's lien or admit that the original title was lost or stolen, the DMV refused to register the vehicle, in which they claim to have invested over $100,000 and which they claim could have rented for $1,000 per day. (Compl. ¶ 87). Plaintiffs allege deprivation of their property rights in violation of the Fifth Amendment. (Compl. ¶ 87).

b.    Purchase and Registration of Motor Home

According to plaintiffs, in December 1995, Gomes and Rossi put together a "bogus" deal to sell plaintiffs the "last remaining" Safari motor home from Tag Motors and to supply them with renter's insurance on their two motor homes. (Compl. ¶ 90). Plaintiffs allege that Tag Motors, Gomes and Rossi failed to inform them (1) that the Safari had already been sold to defendants Nancy Langdon and John Langdon (collectively, the Langdons); and (2) that in September 1995, Gomes convinced Key Bank to lend the Langdons $100,000, using the Safari as collateral. (Compl. ¶ 90).

Plaintiffs allege that in April 1996, "at a phony purchase and closing," they signed

19

paperwork to borrow $100,000 to purchase the Safari and paid $1,000 to Rossi for rental insurance on both the Safari and the other motor home they owned, but Gomes and Rossi did not give them a copy of the loan contract. (Compl., ¶ 91). According to plaintiffs, they received only a temporary registration and insurance card. (Compl., ¶ 91). Plaintiffs allege that after two months, they still had not received an insurance policy, signed bank note, title or registration to the Safari, notwithstanding that they had paid "a small fortune" in renovations and repairs to the motor home. (Compl., ¶ 91). Plaintiffs further allege that when the temporary registration expired, Gomes and Rossi extorted $1,000 per month from them, claiming that they otherwise would not issue another registration. (Compl., ¶ 91). According to plaintiffs, the extortion continued for one year, until April 1997. (Compl., ¶ 91).

Plaintiffs allege that in April 1997, they were contacted by Gomes, who proposed that if they agreed to finance another motor home at Tag Motors through Key Bank, he and Rossi would issue title and registration documents for both motor homes to plaintiffs. (Compl., ¶ 92). According to plaintiffs, "the truth became obvious" in 1997 that "Gomes had sold the Safari to his own corporate officers, who had a loan owed to Key Bank * * * [which], in turn, allowed Gomes and Rossi to sell and insure their repossessed motor homes on Tag [Motor's] lot * **, and just 4 days before releasing the Safari to the Plaintiff [sic], Gomes and Rossi had 11 motor homes burnt to the ground for insurance." (Compl., ¶ 92). Plaintiffs further maintain that Key Bank "knew of, and profited from all of this fraud, as Rossi, an insurance broker, was insuring the Key Bank new, used, and repossessed motor homes for over 100% of their true value, and as Key Bank was the lien holder * * * [and] one of the 'loss payees' on the insurance policies." (Compl., ¶ 93).

20

In addition, plaintiffs allege that defendant Felix Grucci (Grucci), who was the Supervisor of defendant the Town of Brookhaven at the time, ignored their complaints regarding the fraud perpetrated upon them by Tag Motors. (Compl. ¶ 88).

b.     Attempted Repossession of Motor Homes

Plaintiffs allege that "under the pretense of hiring the Plaintiff's [sic] first motor home," Complete RV attempted to steal the motor home by taking physical possession of it and attempting to buy the bank note securing the motor home from Fleetwood Credit. (Compl., ¶ 86).

Plaintiffs allege that in February 2000, while Thomas was away on business, Grucci authorized officers of defendant Town of Brookhaven Civil Code Enforcement to stalk and photograph Dianne during "an attempt at an illegal repossession." (Compl. ¶ 88). Plaintiffs further allege that at the same time, John Langdon and Jones called Dianne and threatened to enter her home and cause her harm if she did not permit them to take all of plaintiffs' motor homes. (Compl. ¶ 88).

Plaintiffs allege that on November 5, 2001, they "were the victims of an illegal repossession" of their Safari motor home by Jones and officers of the SCPD Fifth Precinct. (Compl. ¶ 94). Plaintiffs further maintain that the police and the Suffolk County District Attorney did nothing to stop the repossession. (Compl., ¶ 94). According to plaintiffs, the repossession violated their Fifth and Fourteenth Amendment rights, and resulted in the loss of two-thirds of their business income. (Compl. ¶ 94).

### c. Extortion

Plaintiffs allege that Teamsters and defendants Thomas O'Donnell Junior (O'Donnell Jr.) and Thomas O'Donnell Senior (O'Donnell Sr.), who provide union drivers to take vehicles to union film locations, interfered with plaintiffs' ability to lease their vehicles unless they made payments to them and continued to pay Gomes at Tag Motors. (Compl. ¶ 89). Plaintiffs allege that after they refused, O'Donnell Jr. attempted to extort money from producers and directors when they used plaintiffs' motor homes. (Compl. ¶ 89). Plaintiffs maintain that as a result of the extortion, most of the producers were forced to use a motor home company specified by O'Donnell Jr. (Compl. ¶ 89). According to plaintiffs, Teamsters tampered with their telephone lines, and prevented them from running their business by stealing and coercing their clients. (Compl. ¶ 89).

### B. Procedural Background

On November 1, 2002, plaintiffs commenced this civil rights action pursuant to, *inter alia*, 42 U.S.C. § 1983. By order dated March 17, 2003, the Honorable Arthur D. Spatt[6] adopted a February 14, 2003 report and recommendation of Magistrate Judge E. Thomas Boyle and <u>sua sponte</u> dismissed the complaint without prejudice to the filing of an amended complaint within thirty (30) days from the date thereof. By order dated April 18, 2003, Judge Spatt granted plaintiffs an additional thirty (30) days within which to file the amended complaint. On May 19, 2003, one day after the extended deadline, plaintiffs filed an amended complaint against the

---

[6] This case was randomly reassigned from Judge Spatt to the Honorable Denis R. Hurley on June 20, 2003, and from Judge Hurley to me on October 16, 2003.

above-named defendants alleging, *inter alia*, violations of their Fifth and Fourteenth Amendment rights; as well as violations of 18 U.S.C. Chapter I, §§ 2, 3, 4[7]; the "Intellectual Property Act"[8];

---

[7] Plaintiffs do not allege any specific facts relating to their 18 U.S.C. §§ 2 and 3 claims. With respect to their § 4 claim, they allege that the "law enforcement agencies" took part in, or profited from, the fraud committed in the theft of Thomas's "Hollywood plan," and failed to do their jobs. However, there is no private right of action under 18 U.S.C. § 4. See, e.g. Garay v. U.S. Bancorp., 303 F.Supp.2d 299, 303 (E.D.N.Y. 2004)(holding that there is no private cause of action for an obstruction of justice claim); United States ex rel. Farmer v. Kaufman, 750 F.Supp. 106, 108 (S.D.N.Y. 1990)(holding that there is no authority for private citizens to bring suit under 18 U.S.C. § 4); Dugar v. Coughlin, 613 F.Supp. 849, 852, n. 1 (S.D.N.Y. 1985)(holding that there is no private right of action under 18 U.S.C. § 4, nor can that statute be used as a predicate for a section 1983 action). Accordingly, plaintiffs' claim alleging a violation of 18 U.S.C. § 4 is dismissed sua sponte for failure to state a cause of action.

Moreover, 18 U.S.C. §§ 2 and 3 do not explicitly create a private right of action. Courts rarely imply a private right of action under a criminal statute absent a clear statutory basis for such an inference. See Chrysler Corp. v. Brown, 441 U.S. 281, 316, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979); Daniel v. Safir, 175 F.Supp.2d 474, 481 (E.D.N.Y. 2001), aff'd, 42 Fed.Appx. 528 (2d Cir. Aug. 21, 2002); Vasile v. Dean Witter Reynolds Inc., 20 F.Supp.2d 465, 477 (E.D.N.Y. 1998), aff'd, 205 F.3d 1327 (2d Cir. 2000). In determining whether the existence of a private right of action can be fairly inferred from a reading of the statute, the court must examine (1) whether the plaintiff is a member of a class for whose special benefit the statute was enacted; (2) whether there is any indication of legislative intent to create or deny a private right of action; (3) whether it would be consistent with the purposes of the statutory scheme to create a private right of action; and (4) whether the cause of action is one traditionally relegated to state law. Dubai Islamic Bank v. Citibank, N.A., 126 F.Supp.2d 659, 668 (S.D.N.Y. 2000); Pentagen Technologies Intern., Ltd. v. CACI Intern. Inc., 93 Civ. 8512, 94 Civ. 0441, 94 Civ. 8164, 1996 WL 435157, at * 11 (S.D.N.Y. Aug. 2, 1996); Casey Systems, Inc. v. Firecom, Inc., 94 Civ. 9327, 1995 WL 704964, at * 3 (S.D.N.Y. Nov. 29, 1995).

18 U.S.C. §§ 2 and 3 do not provide a benefit to any class more limited than the public at large. Moreover, there is no indication in the limited legislative history of these statutes of an intent to create a private civil remedy for violations thereof and it would be inconsistent with the purposes of the underlying statutory scheme of those statutes to imply the creation of a private right of action. Accordingly, since there is no statutory basis for inferring that a private right of action was created in favor of "victims" of aiding and abetting liability or accessories in fact, plaintiffs' claims alleging violations of those statutes are also dismissed sua sponte. See, e.g. Dubai Islamic Bank, 126 F.Supp.2d at 668 (dismissing plaintiff's negligence per se claims based on a violation of 18 U.S.C. § 1956 because that statute did not provide a benefit to any class of persons more limited than the public at large and did not give rise to a private cause of action); Pentagen Technologies, 1996 WL 435157, at * 11 (dismissing plaintiff's claim under 18 U.S.C.

the Privacy Act of 1974 (Privacy Act)[9]; the

---

§ 1031 because the text and statutory scheme indicate that Congress did not intend to imply a private right of action); <u>Korenyi v. Dept. of Sanitation of City of New York</u>, 699 F.Supp. 388, 397 (E.D.N.Y. 1988)(dismissing plaintiff's section 1983 claim based on 18 U.S.C. § 874 because nothing in the language or history of that statute suggested that it was intended to create a private right of action).

[8] Plaintiffs' claims alleging violations of the "Intellectual Property Act" relate solely to theft of Thomas's "Hollywood Plan." As there is no federal or state statute designated as the "Intellectual Property Act," plaintiffs' claims will be interpreted as a state law claims for conversion and the misappropriation of a property right.

[9] The Privacy Act of 1974, § 2(a)(5), 88 Stat. 1896, was enacted "in order to protect the privacy of individuals identified in information systems <u>maintained by Federal agencies</u>," and regulates "the collection, maintenance, use, and dissemination of information <u>by such agencies</u>." (Emphasis added). <u>Doe v. Chao</u>, 540 U.S. 614, 618, 124 S.Ct. 1204, 157 L.Ed.2d 1122 (2004); <u>see also</u> <u>Bechhoefer v. U.S. Dept. of Justice D.E.A.</u>, 209 F.3d 57, 59 (2d Cir. 2000)(holding that the Privacy Act, 5 U.S.C. § 552a, was enacted "to provide certain safeguards for an individual against an invasion of personal privacy, by requiring governmental agencies to maintain accurate records and providing individuals with more control over the gathering, dissemination, and accuracy of agency information about themselves."). The only claim that plaintiffs potentially assert in the amended complaint under the Privacy Act is pursuant to 5 U.S.C. § 552a(b), which protects individuals from the disclosure of certain records <u>by a federal agency</u>. See 5 U.S.C. § 552(g)(1)(D) (providing for a civil action against an agency in federal court whenever the agency fails to comply with any provisions of the statute in such a was as to have an adverse effect on an individual). Section 552(g)(1) of the Privacy Act specifically creates a private right of action for violations of the Act's prohibition against disclosure, but such an action may be brought only against an "agency," as defined in the Freedom of Information Act (FOIA), 5 U.S.C. § 552(f), and not against individuals. See <u>Bechhoefer</u>, 209 F.3d at 59, n. 1; <u>Schwartz v. U.S. Dept. of Justice</u>, 94 Civ. 7476, 1995 WL 675462, at * 6 (S.D.N.Y. Nov. 14, 1995), <u>aff'd</u>, 101 F.3d 686 (2d Cir. 1996); <u>Williams v. McCausland</u>, 791 F.Supp. 992, 1000 (S.D.N.Y. 1992). Moreover, the Privacy Act is enforceable only against federal agencies, and does not apply to state agencies or bodies. See <u>Stoianoff v. Commissioner of Motor Vehicles</u>, 107 F.Supp.2d 439, 444-445 (S.D.N.Y. 2000), <u>aff'd</u>, 12 Fed.Appx. 33 (2d Cir. May 25, 2001); <u>Pritzker v. City of Hudson</u>, 26 F.Supp.2d 433, 441 (N.D.N.Y. 1998); <u>Mamarella v. County of Westchester</u>, 898 F.Supp. 236 (S.D.N.Y. 1995).

The only federal agency names as a defendant in the amended complaint is the FBI, but none of plaintiffs' purported Privacy Act claims relation to that defendant. Rather, plaintiffs only assert two allegations of purportedly unlawful disclosure of records: (1) that North Fork released or used their credit information to others; and (2) that Kanas, as president of North Fork, may have released information relating to their business account at North Fork to Bowman, a Town of

"Corrupt Practices Act"[10]; the Truth in Lending Act (TILA); the "Fair Collections Practices

Act"[11]; and the Freedom of Information Act of 1966 (FOIA)[12]. Plaintiffs seek compensatory

---

Riverhead official. As neither North Fork nor Kanas are federal agencies within the meaning of the Privacy Act of 1974, plaintiffs fail to state a claim under that statute. See 5 U.S.C. §§ 552(f), 552a; see e.g. Mandel v. U.S. Office of Personnel Management, 244 F.Supp.2d 146, 153 (E.D.N.Y. 2003), aff'd, 79 Fed.Appx. 479 (2d Cir. Oct. 31, 2003) (holding that plaintiff failed to state a cognizable claim against the individual defendant because under the Privacy Act, a plaintiff may file suit only against an agency, and not against an individual). Accordingly, plaintiffs' claims for violations of the Privacy Act are dismissed sua sponte in their entirety for failure to state a cause of action.

However, giving the amended complaint the liberal interpretation it is due on a motion to dismiss, I will construe plaintiffs' claims against North Fork and Kanas for violations of the Privacy Act of 1974 to be claims for violations of the Right to Financial Privacy Act (RFPA) of 1978, 12 U.S.C. §§ 3401-3422, which can be brought against, inter alia, financial institutions.

[10] There is no federal or state statute simply entitled "The Corrupt Practices Act". There is a "Foreign Corrupt Practices Act of 1977," 15 U.S.C. § 78dd-1, et seq., which generally prohibits domestic concerns from bribing foreign officials to obtain a business advantage. That statute is clearly inapplicable to the instant action. The only possibly applicable statute appears to be the "Racketeer Influenced and Corrupt Organizations Act" (RICO), 18 U.S.C. §§ 1961-1968. Plaintiffs have standing to assert a RICO claim, insofar as they are alleging an injury to their business, A*Longi Productions, as a result of any RICO violation. See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985) (holding that a plaintiff only has standing to assert a RICO claim if he has been injured in his business or property by the conduct constituting the violation); J.S. Service Center Corp. v. General Elec. Techincal Services Co., 937 F.Supp. 216, 220 (S.D.N.Y. 1996) (accord). However, plaintiffs' amended complaint does not adequately plead a claim under RICO. See Sedima, 473 U.S. at 496, 105 S.Ct. 3275 (holding that to state a RICO claim, a plaintiff must plead [1] conduct [2] of an enterprise, [3] through a pattern [4] of racketeering activity); Anatian v. Coutts Bank (Switzerland) Ltd., 193 F.3d 85, 88 (2d Cir. 1999) (accord). As plaintiffs fail to plead any of the elements necessary to state a RICO claim, their claims alleging violations of "The Corrupt Practices Act" are dismissed sua sponte.

[11] Presumably, plaintiffs mean the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692, et seq.

[12] The Freedom of Information Act (FOIA), 5 U.S.C. § 552(a), is "exclusively a disclosure statute" and does not foreclose disclosure. Chrysler Corp., 441 U.S. at 292, 99 S.Ct. 1705. Accordingly, there is no private right of action to enjoin disclosure of information under FOIA. See, Id. at 294; Stoianoff, 107 F.Supp.2d at 444. Moreover, FOIA applies only to

damages in the amount of five billion dollars ($5,000,000,000).

Defendants the State, Governor Pataki, the New York State Police, the New York State Department of Taxation and Finance, the New York State Division of Corporations, the New York State Department of State, New York State Supreme Court Justice Marvin Segal (Justice Segal), Nassau County New York State Supreme Court (Nassau County Supreme Court), New York State Supreme Court Justice Paul Baisley (Justice Baisley), Suffolk County New York State Supreme Court (Suffolk County Supreme Court), the DMV, the Titles Bureau, the New York State Insurance Department, the New York State Banking Department, the New York State Department of Consumer Affairs, and New York State Attorney General Eliot Spitzer (collectively, the State defendants); defendants Twomey Latham and Kelly (collectively, the Twomey Latham defendants); and defendants Town of Brookhaven and Grucci separately move pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the amended complaint. Defendants Kanas, MBA and North Fork separately move pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure to dismiss the amended complaint. Defendants Verizon, Grand Am and AT&T separately move pursuant to Rules 8 and 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the amended complaint. Defendant Fleetwood Credit moves, presumably pursuant to Rule 12(b)(6), to dismiss the amended complaint for failure to state a cause of action. Defendant Great American moves pursuant to Rules 8, 12(b)(6) and 41(b) of the Federal Rules of Civil Procedure to dismiss the complaint.

---

"agencies" as defined in 5 U.S.C. § 551(1). See, Stoianoff, 107 F.Supp.2d at 444. Like plaintiffs' Privacy Act claims, plaintiffs' only potential FOIA claims relate to the purported improper disclosure of certain information. Since none of the defendants to whom those claims relate are "agencies" within the meaning of the statute, plaintiffs' FOIA claims are dismissed sua sponte in their entirety for failure to state a claim.

Defendant Grubb & Ellis moves pursuant to Rule 12(c) of the Federal Rules of Civil Procedure for judgment on the pleadings. Defendant O'Connor and defendants Teamsters, O'Donnell Sr. and O'Donnell Jr. (collectively, the Teamsters defendants) separately move pursuant to Rule 12(b)(6) to dismiss the amended complaint. Defendants the FBI, Fanning Sr., Fanning Jr. and Grupe (collectively the FBI defendants) move pursuant to Rules 12(b)(1), 12(b)(2), 12(b)(5) and 12(b)(6) to dismiss the amended complaint. Defendant Republic Western moves pursuant to Rule 12(b)(6) to dismiss the complaint and pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment in its favor. Defendant Town of Riverhead cross-moves pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the amended complaint as against it.

Plaintiffs oppose the various motions claiming (1) that given their unique set of circumstances, defendants should be compelled to adhere to "pro se law" ("Plaintiff's [sic] Answer to ALL Agency and Non-Agency Motions to Dismiss" [Plf. Opp.], pp. 14-16); (2) that defendants fail to raise any "reasonable doubt" that they can prove no set of facts in support of their claims; (3) that they were told by the "pro se staff" of the Court that they could aver all their claims generally because of the number of defendants; and (4) that prior judges assigned to this case have denied similar motions to dismiss made by defendants.[13]

---

[13] Contrary to plaintiffs' contention, Judge Spatt denied any prior motions to dismiss as moot after he adopted the report and recommendation of Magistrate Judge Boyle and dismissed the original complaint _sua sponte_. Moreover, although certain of the defendants thereafter moved before Judge Hurley for a pre-motion conference to re-file their motions to dismiss, this matter was reassigned to me before such conference was held. Therefore, there has not previously been a ruling on the merits of any prior motions to dismiss filed in this action. Furthermore, the issue of the sufficiency of the amended complaint has not heretofore been presented to the Court.

For the reasons set forth herein, the motions are granted in part and denied in part.

II.  DISCUSSION

    A.  Subject Matter Jurisdiction

        1.  Standard of Review

The State defendants, Twomey Latham defendants, Town of Brookhaven, Grucci and the FBI defendants move to dismiss the complaint pursuant to, *inter alia*, Rule 12(b)(1) of the Federal Rules of Civil Procedure for lack of subject matter jurisdiction. "In determining whether the federal courts have subject matter jurisdiction over a cause of action, a district court must look to the way the complaint is drawn to see if it claims a right to recover under the laws of the United States." IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1055 (2d Cir.1993) (quoting Goldman v. Gallant Securities, Inc., 878 F.2d 71, 73 [2d Cir.1989]). Plaintiffs have the burden of establishing that subject matter jurisdiction exists. Lunney v. U.S., 319 F.3d 550, 554 (2d Cir. 2003).

        2.  Eleventh Amendment

The State Defendants contend that this action must be dismissed as against the State, its agencies, and the individual State defendants in their official capacity as barred by the Eleventh Amendment to the United States Constitution.

The Eleventh Amendment bars section 1983 suits against States or governmental entities that are considered "arms of the State" "unless the State has waived its immunity * * *, or unless Congress has exercised its undoubted power under § 5 of the Fourteenth Amendment to override

27

that immunity." <u>Will v. Michigan Dept. of State Police</u>, 491 U.S. 58, 66, 70, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)(citations omitted). Moreover, a suit against a state official in his or her official capacity is not a suit against the official personally, but rather is a suit against the official's office and, thus, is no different from a suit against the State itself. <u>Id.</u>, at 71, 109 S.Ct. 2304. Accordingly, the Eleventh Amendment bars plaintiffs' section 1983 claims against the State, its agencies and the individual State defendants in their official capacities.

### 3.    Claims involving Nonpayment of Taxes

The State defendants contend that pursuant to 28 U.S.C. § 1341, this Court lacks subject matter jurisdiction to hear plaintiffs' claims regarding the alleged nonpayment of taxes.

The Tax Injunction Act of 1937 (TIA) provides that "district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. The TIA "generally prohibits federal district courts from enjoining state tax administration except in instances where the state-court remedy is not 'plain, speedy and efficient.'" <u>Rosewell v. LaSalle Nat. Bank</u>, 450 U.S. 503, 512, 101 S.Ct. 1221, 67 L.Ed.2d 464 (1981). The TIA "has its roots in equity practice, in principles of federalism, and in recognition of the imperative need of a State to administrate its own fiscal operations. * * * This last consideration was the principal motivating force behind the Act: this legislation was first and foremost a vehicle to limit drastically federal district court jurisdiction to interfere with so important a local concern as the collection of taxes." <u>Id.</u> at 522, 101 S.Ct. 1221 (internal quotations, citations and footnote omitted).

The Supreme Court has held that whether or not the TIA, standing alone, bars federal

courts from granting monetary damages in section 1983 cases, "the principle of comity bars

federal courts from granting damages relief in such cases." Fair Assessment in Real Estate

Ass'n, Inc. v. McNary, 454 U.S. 100, 107, 102 S.Ct. 177, 70 L.Ed.2d 271 (1981); see also Long

Island Lighting Co. v. Brookhaven, 889 F.2d 428, 431 (2d Cir. 1989)(holding that while it is the

TIA that prevents federal courts from giving injunctive or declaratory relief, as long as there is a

plain, speedy and efficient remedy in state court, it is the principle of comity that prevents a

taxpayer from seeking damages in a section 1983 action if a plain, adequate and complete

remedy may be had in state court). Thus, "taxpayers are barred by the principle of comity from

asserting § 1983 actions against the validity of state tax systems in federal courts." McNary, 454

U.S. at 116, 102 S.Ct. 177.

     Plaintiffs are challenging the State's dissolution of their business for the nonpayment of

franchise taxes as a violation of their due process rights under the Fifth Amendment. As in

McNary, this claim would require this Court to determine that the State's administration of the

franchise tax violated plaintiffs' constitutional rights and, thus, would require improper scrutiny

of state tax assessment practices. Moreover, any relief granted on plaintiffs' claim would

impermissibly operate to suspend the collection of state franchise taxes, "a form of federal-court

interference previously rejected by [the Supreme] Court on principles of federalism," McNary,

454 U.S. at 115, 102 S.Ct. 177, and to reduce the flow of state tax revenue. Furthermore,

plaintiffs have a plain, adequate and complete remedy available to them, insofar as they can

commence a section 1983 action in state court in which they can assert their federal rights. See,

e.g. Bernard v. Village of Spring Valley, New York, 30 F.3d 294, 297 (2d Cir. 1994)(finding that

because procedurally adequate state remedies, such as a section 1983 action in state court, were

available to the plaintiff, his federal action raising constitutional objections to the village's tax assessment was barred by principles of comity). Accordingly, plaintiffs' claim against the State relating to the dissolution of their business for the nonpayment of state taxes is dismissed for lack of jurisdiction.

### 4. Sovereign Immunity

The FBI defendants contend that this Court lacks subject matter jurisdiction of the claims against them based on the doctrine of sovereign immunity.

"[U]nder the principle of sovereign immunity * * * the United States may not be sued without its consent and * * * the existence of consent is a prerequisite for jurisdiction." Adeleke v. U.S., 355 F.3d 144, 150 (2d Cir. 2004)(citing U.S. v. Mitchell, 463 U.S. 206, 212, 103 S.Ct. 2961, 77 L.Ed.2d 580 [1983]). Sovereign immunity is a jurisdictional bar which, absent a waiver, shields the federal government, its agencies and its officers acting in their official capacities from suit. Department of Army v. Blue Fox, Inc., 525 U.S. 255, 260, 119 S.Ct. 687, 142 L.Ed.2d 718 (1999); F.D.I.C. v. Meyer, 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994); see Dotson v. Griesa, 398 F.3d 156, 177 (2d Cir. 2005), cert. denied, ___ S.Ct. ___, 2006 WL 1584453 (June 12, 2006) (holding that the doctrine of sovereign immunity also bars suits against federal agencies and federal officers acting in their official capacities). A waiver of sovereign immunity must be "unequivocally expressed" in statutory text, U.S. v. Mitchell, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980), and will be strictly construed and limited to its express terms. Lunney, 319 F.3d at 554.

Plaintiffs' constitutional claims against the FBI and Fanning Sr., Fanning Jr. and Grupe

30

(collectively, the individual FBI defendants), in their official capacities, are barred by the doctrine of sovereign immunity. See, e.g. Conklin v. Doe, No. 01 Civ. 987, 2002 WL 227067, at * 4 (S.D.N.Y. Feb. 13, 2002)(dismissing the plaintiff's section 1983 claims against the FBI, *inter alia*, as barred by the doctrine of sovereign immunity); Haughton v. F.B.I., No. 98 Civ. 3418, 1999 WL 1133346, at * 5 (S.D.N.Y. Dec. 10, 1999)(dismissing the plaintiff's constitutional claims against the FBI as barred by the doctrine of sovereign immunity). Plaintiffs, who have the burden of establishing by a preponderance of the evidence the existence of subject matter jurisdiction, Lunney, 319 F.3d at 554, have not identified any "unequivocally expressed" waiver of the FBI defendants' sovereign immunity. Accordingly, plaintiffs' constitutional claims against the FBI and the individual FBI defendants in their official capacities are dismissed for lack of subject matter jurisdiction.

B.     Lack of Personal Jurisdiction and Insufficiency of Process

1.     Standard of Review

The FBI defendants move pursuant to, *inter alia*, Rules 12(b)(2) and 12(b)(5) to dismiss the complaint for lack of personal jurisdiction and insufficiency of process, respectively. In resolving issues of personal jurisdiction, the court must determine (1) whether, under the laws of the forum state, there is jurisdiction over the defendant; and (2) whether an exercise of jurisdiction under the laws of the forum state is consistent with federal due process requirements. Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 784 (2d Cir. 1999). In opposing a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant. * * * Where a court

[has chosen] not to conduct a full-blown evidentiary hearing on the motion, the plaintiff need make only a prima facie showing of jurisdiction through its own affidavits and supporting materials." Id. (internal quotations and citations omitted); see also In re Magnetic Audiotape Antitrust Litigation, 334 F.3d 204, 206 (2d Cir. 2003)(holding that on a motion to dismiss the plaintiff bears the burden of establishing jurisdiction over the defendant and that, prior to discovery, a plaintiff may defeat a motion to dismiss based on legally sufficient allegations of jurisdiction). "Unlike a motion to dismiss pursuant to Rule 12(b)(6), deciding a Rule 12(b)(2) motion necessarily requires resolution of factual matters outside the pleadings." ADP Investor Communication Services, Inc. v. In House Attorney Services, Inc., 390 F.Supp.2d 212, 217 (E.D.N.Y. 2005). "Where the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor." Wickers Sportswear, Inc. v. Gentry Mills, Inc., 411 F.Supp.2d 202, 205-206 (E.D.N.Y. 2006)(quoting Whitaker v. American Telecasting, Inc., 261 F.3d 196, 208 [2d Cir. 2001]); see also Magnetic Audiotape, 334 F.3d at 206 (holding that a plaintiff's averments of jurisdictional facts must be credited as true); ADP Investor, 390 F.Supp.2d at 217 (holding that where no jurisdictional discovery has been conducted, the plaintiff need only establish a prima facie case, and allegations of jurisdictional fact must be construed in a light most favorable to the plaintiff).

To resolve a motion to dismiss pursuant to 12(b)(5) for insufficiency of process, the court "must look to matters outside the complaint" to determine what steps, if any, the plaintiff took to effect service. C3 Media & Marketing Group, LLC v. Firstgate Internet, Inc., No. 04 Civ. 9508, 2005 WL 2347925, at * 3 (S.D.N.Y. Sept. 26, 2005); see also Mende v. Milestone Technology, Inc., 269 F.Supp.2d 246, 251 (S.D.N.Y. 2003). In opposing a motion to dismiss pursuant to Rule

12(b)(5), the plaintiff bears the burden of establishing that service was adequate. <u>C3 Media</u>, 2005 WL 2347925, at * 3; <u>see also</u> <u>Mende</u>, 269 F.Supp.2d at 251. The court may not "draw argumentative inferences in the plaintiff's favor, but [must] construe jurisdictional allegations liberally and take as true uncontroverted factual allegations." <u>Mende</u>, 269 F.Supp.2d at 251 (internal quotations and citation omitted).

As to Fanning Sr., a summons was issued on July 2, 2003 and a certificate of service filed on September 17, 2003 indicates that the summons and amended complaint were served by the United States Marshal Service upon Fanning Sr., c/o the FBI, on August 28, 2003. The FBI defendants conclusorily allege in their memorandum of law that plaintiffs failed to serve Fanning Sr. with process, (Memorandum of Law of FBI Defendants, p. 9), but fail to include an affidavit from Fanning Sr. to that effect. Although, in New York, "a defendant's sworn denial of receipt of service * * * rebuts the presumption of proper service established by [a] process server's affidavit * * *[,] no evidentiary hearing is required where the defendant fails to swear to 'specific facts to rebut the statements in the process server's affidavits.'" <u>Old Republic Ins. Co. v. Pacific Financial Services of America, Inc.</u>, 301 F.3d 54, 57-58 (2d Cir. 2002). "In the absence of facts to the contrary, there is a presumption that service was properly effected." <u>CSC Holdings, Inc. v. Fung</u>, 349 F.Supp.2d 613, 616, 617 (E.D.N.Y. 2004). Since the FBI defendants do not provide any affidavit or sworn denial of receipt of service, and there is no other evidence indicating that service was not properly effected on Fanning Sr., no evidentiary hearing is required on this issue and the branches of the FBI defendants' motion to dismiss the amended complaint against Fanning Sr. for lack of personal jurisdiction and insufficiency of process are denied.

C. Failure to State a Claim

1. Standard of Review

All of the moving defendants, with the exception of Grubb & Ellis, move pursuant to

Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the complaint for failure to state

a claim[14]. A motion to dismiss for failure to state a claim under Rule 12(b)(6) should be granted

only where "it appears beyond a doubt that plaintiff can prove no set of facts in support of his

claim that would entitle him to relief." Levitt v. Bear Stearns & Co., 340 F.3d 94, 101 (2d Cir.

2003)(internal quotations and citations omitted). In deciding a motion to dismiss, the Court must

liberally construe the claims, accept all factual allegations in the complaint as true, and draw all

reasonable inferences in favor of the plaintiff. See, Cargo Partner AG v. Albatrans, Inc., 352

F.3d 41, 44 (2d Cir. 2003); New v. Ashcroft, 293 F.Supp.2d 256, 257 (E.D.N.Y. 2003). The

court's task "is merely to assess the legal feasability of the complaint, not to assay the weight of

the evidence which might be offered in support thereof." Levitt, 340 F.3d at 101 (internal

quotations and citations omitted). The issue is not whether a plaintiff will ultimately prevail but

whether he or she is entitled to offer evidence to support the claims. See, New, 293 F.Supp.2d at

257 (citing Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 [2d Cir. 1995]). The Court

must limit itself to the facts alleged in the complaint, to any documents attached to the complaint

as exhibits or incorporated by reference therein, to matters of which judicial notice may be taken,

---

[14] As Grubb & Ellis has already filed an answer to the amended complaint, it moves
pursuant to Rule 12(c) for judgment on the pleadings rather than pursuant to Rule 12 (b)(6) to
dismiss for failure to state a cause of action. Since the standard of review on a motion to dismiss
pursuant to Fed. R. Civ. P. 12(b)(6) is the same standard applied to a motion for judgment on the
pleadings pursuant to Fed. R. Civ. P. 12(c), see Ziemba v. Wezner, 366 F.3d 161, 163 (2d Cir.
2004), there is no distinction in the analysis. Therefore, Grubb & Ellis's contentions will be
addressed in this section as well.

or to documents within plaintiff's possession or of which plaintiffs had knowledge and relied on in bringing suit. See, Brass v. American Film Technologies, Inc., 987 F.2d 142, 150 (2d Cir. 1993); Spencer Trask Software and Information Services. LLC v. RPost Intern. Ltd., No. 02 Civ. 1276, 2003 WL 169801, at * 4 (S.D.N.Y. Jan. 24, 2003).

### 2. Statute of Limitations

#### a. Section 1983 Claims

The State defendants, Verizon, Grubb & Ellis, the Twomey Latham defendants, the Teamsters defendants, AT&T and O'Connor contend that to the extent plaintiffs' section 1983 claims relate to acts occurring more than three years prior to the commencement of this action, those claims are time-barred. The Town of Riverhead contends that plaintiffs' claims against it relate to conduct that occurred no later than 1998 and, thus, their claims against it are time-barred. Great American contends that all of plaintiffs' allegations against it pertain to conduct occurring prior to July 1997 and, thus, their claims against it are time-barred.

Claims pursuant to 42 U.S.C. §1983 are governed by New York's three year statute of limitations. See Owens v. Okure, 488 U.S. 235, 249-250, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989); Pearl v. City of Long Beach, 296 F.3d 76, 79 (2d Cir. 2002). However, although state law governs the applicable limitations period, federal law governs when a claim accrues. See Covington v. City of New York, 171 F.3d 117, 121 (2d Cir. 1999). Generally, under federal law, a claim accrues when "the plaintiff knows or has reason to know of the injury which is the basis of his action." Id.

Plaintiffs' allegations regarding the purported failure of the SCPD Fifth Precinct, Jones,

the former and present Suffolk County District Attorneys, and Detectives Gardner and Calabrese to investigate the alleged bank and insurance fraud relate to conduct occurring in 1996. Since the original complaint against, *inter alia*, Jones and Spota, the Suffolk County District Attorney, was not filed until November 1, 2002, and the amended complaint against, *inter alia*, the SCPD Fifth Precinct and Detectives Gardner and Calabrese was not filed until May 19, 2003, those claims relating to the failure to investigate are dismissed as time-barred.

Plaintiffs allege conduct by Fleetwood Credit with respect to title to their first motor home occurring in 1995[15]. Since plaintiffs were clearly aware of the underlying facts in 1995, but did not file the complaint until November 1, 2002, more than three years later, their section 1983 claim against Fleetwood Credit is time-barred.

Plaintiffs' allegations against Verizon and AT&T which attempt to state a section 1983 claim relate to conduct occurring no later than May 1996. Since plaintiffs hired a private investigator in June 1997 to investigate the conduct, they were clearly aware of the conduct more than three years prior to the filing of the complaint and, therefore, to the extent plaintiffs' assert a section 1983 claim against Verizon and AT&T those claims are dismissed as time-barred. Moreover, plaintiffs' allegations that the Teamsters defendants were involved in tampering with their telephone lines and that the New York State Attorney General's Office failed to investigate plaintiffs' complaints likewise pertain to conduct occurring no later than May 1996 and, thus, are time-barred as well.

To the extent plaintiffs' allegations against Rossi, Gomes, Tag Motors, the Langdons,

---

[15] Plaintiffs allege that 2001 was six years after the conduct of Fleetwood Credit, thus indicating that Fleetwood Credit's conduct occurred in 1995.

Key Bank and Great American regarding the purchase and ownership of motor homes state a section 1983 claim, those allegations pertain to conduct occurring no later than April 1997 and, since plaintiffs were aware of the conduct for more than three years prior to the filing of their complaint, to the extent plaintiffs seek to assert a section 1983 claim against Rossi, Gomes, Tag Motors, the Langdons and Great American relating to their purchase and ownership of three motor homes, those claims are dismissed as time-barred.

Plaintiffs' remaining claims are either timely, or it cannot be ascertained from the face of the amended complaint when those claims accrued. Accordingly, to the extent any of the moving defendants seek dismissal of any other section 1983 claim as time-barred, those branches of their motions are denied.

### b. Non-Section 1983 Claims

#### i. Federal Communications Act

Verizon and AT&T contend that plaintiffs' non-section 1983 claims against them are barred by the two year statute of limitations prescribed by the federal Communications Act of 1934, 47 U.S.C. § 415(b).

47 U.S.C. § 415(b) provides, in relevant part, that, with exceptions not relevant here, "[a]ll complaints against carriers for the recovery of damages not based on overcharges shall be filed with the [Federal Communications] Commission [FCC] within two years from the time the cause of action accrues, and not after * * *." Although section 415(b) expressly bars only complaints filed with the FCC, the two-year statute of limitations has been held to be equally applicable to actions filed in federal district court. See, e.g. Black Radio Network, Inc. v.

NYNEX Corp., 44 F.Supp.2d 565, 582 (S.D.N.Y. 1999); Nordlicht v. New York Telephone Co., 617 F.Supp. 220, 228 (S.D.N.Y. 1985)(citing cases), abrogated on other grounds as stated in Fax Telecommunications Inc. v. AT&T, 138 F.3d 479, 486 (2d Cir. 1998).

The acts of which plaintiffs complain with respect to Verizon and AT&T are not violations of specific provisions of the Communications Act, 47 U.S.C. § 151, *et seq.* However, the Communications Act has been held to be applicable, *inter alia*, to claims involving illegal wiretapping, see, e.g. Pavlak v. Church, 727 F.2d 1425, 1427 (9th Cir. 1984); Cole v. Kelley, 438 F.Supp. 129, 145 (C.D.Cal. 1977), and "slamming" conspiracies, see, e.g. US West, Inc. v. Business Discount Plan, Inc., 196 F.R.D. 576, 587-588 (D.Colo. 2000), as well as to fraud claims, see, e.g. Nordlicht, 617 F.Supp. at 222, and conversion claims, see, e.g. MFS Intern., Inc. v. International Telecom Ltd., 50 F.Supp.2d 517, 520 (E.D.Va. 1999), where those claims were preempted and necessarily arose under the Communications Act. But see Indiana Bell Tel. Co. v. Thrifty Call, Inc., No. IP02-0170-C-H/K, 2004 WL 3059705, at * 3 (S.D.Ind. Dec. 2, 2004)(holding that the federal statute of limitations prescribed by the Communications Act does not apply to state law claims for fraud and conspiracy to defraud which are not preempted and are not deemed to arise under federal law); Cooperative Communications, Inc. v. AT&T Corp., 867 F.Supp. 1511, 1519 (D.Utah 1994)(holding that the plaintiff's state law claims which did not arise under the Communications Act were not governed by the Communications Act).

Section 203 of the Communications Act requires common carriers such as AT&T and Verizon to file tariffs with the FCC, which govern the services and rates provided by the carrier. "The legal relationship between a utility and its customers is defined by the tariffs, which consist of the terms and conditions of the utility's service and rates, and supercede all common law

remedies." American Tel. & Tel. Co. v. City of New York, 83 F.3d 549, 552 (2d Cir. 1996); see also Marcus v. AT&T Corp., 138 F.3d 46, 56 (2d Cir. 1998)(stating that the tariffs conclusively and exclusively enumerate the rights and liabilities of the contracting parties).

AT&T correctly notes that claims asserted against a common carrier such as itself and Verizon for breach of a tariff-imposed duty arise under the Communications Act. To the extent plaintiffs assert state law fraud or conversion claims against AT&T and Verizon for their purported improper billing, interruption of telephone service and "slamming," those claims challenge the billing practices and service provided by AT&T and Verizon and, thus, are based on the applicable tariffs. Therefore, plaintiffs' state law claims against AT&T and Verizon arise under the Communications Act. See, e.g. MFS International, 50 F.Supp.2d at 520 (finding that the defendant's state law counterclaims for breach of contract and conversion resulting from purported service interruptions were preempted where they were based on the plaintiff's tariff). Accordingly, the two year statute of limitations prescribed by the Communications Act is applicable to plaintiffs' state law claims against AT&T and Verizon. Since the conduct of which plaintiffs complain with respect to AT&T and Verizon occurred no later than 1997, more than two years prior to the filing of the complaint, and plaintiffs were clearly aware of such conduct at that time, their remaining non-section 1983 claims against AT&T and Verizon are time-barred.[16]

ii.    Conversion Claims

Grubb & Ellis and O'Connor contend that plaintiffs' claims against them are, in effect,

---

[16] In light of this determination, it is unnecessary to consider the remaining contentions of Verizon and AT&T in support of dismissal.

state law claims for conversion, which are governed by a three year statute of limitations pursuant to N.Y. C.P.L.R. § 214.

The Court is not bound by a plaintiff's designation of a claim, but rather must ascertain the essence of claims to determine the appropriate statute of limitations. See Reciprocal Merchandising Services v. All Advertising Associates, Inc., No. 88 Civ. 8055, 1990 WL 52293 (S.D.N.Y. Apr. 13, 1990). In New York, conversion is defined as "any unauthorized exercise of dominion or control over property which interferes with and is in defiance of a superior possessory right of another in the property." Atlanta Shipping Corp. v. Chemical Bank, 818 F.2d 240, 249 (2d Cir. 1987)(citing Meese v. Miller, 79 A.D.2d 237, 436 N.Y.S.2d 496, 5000 [4th Dept. 1981]); see also Vigilant Ins. Co. of America v. Housing Authority of the City of El Paso, Tex., 87 N.Y.2d 36, 44, 637 N.Y.S.2d 342, 660 N.E.2d 1121 (1995)(holding that conversion is the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights).

Plaintiffs allege that in September 1997, Grubb & Ellis and O'Connor tricked Thomas into signing a release of any civil claims against them, the Town of Riverhead and Kelly. To the extent that these claims can be read to allege that Grubb & Ellis and O'Connor, acting in concert with, *inter alia*, the Town of Riverhead, retained and used certain plans or blueprints with respect to the redevelopment of the Grumman property, they state a claim for conversion under New York Law. See, e.g. Baker's Aid, a Div. of M. Raubvogel Co. v. Hussmann Foodservice Co., 730 F.Supp. 1209, 1213 (E.D.N.Y. 1990)(holding that plaintiff's allegations that defendants retained and used certain specifications stated a claim for conversion under New York law).

In New York, the statute of limitations for conversion is three years. N.Y. C.P.L.R. §

214(3). Although in New York, causes of action for conversion generally accrue on the date the alleged conversion occurred and not on the date of discovery, see, Vigilant Ins. Co., 87 N.Y.2d at 44, 637 N.Y.S.2d 342, it is federal law, not state law, that governs the issue of when a cause of action accrues. Covington, 171 F.3d at 121. Under federal law, a cause of action generally does not accrue "until the plaintiff knows or has reason to know of the injury forming the basis of his action." CSC Holdings, Inc. v. Kraut, 169 F.Supp.2d 115, 118 (E.D.N.Y. 2001)(internal quotations and citations omitted). Accordingly, although the conversion alleged may have occurred during the meeting in September 1997, plaintiffs' cause of action for conversion did not accrue until they discovered, or with the exercise of diligence should have discovered, the conversion. Plaintiffs allege in their amended complaint that the day following the meeting, O'Connor told them that the Town of Riverhead had changed its mind regarding using plaintiffs' plans and that shortly thereafter, plaintiffs sent a letter to the Town of Riverhead accusing it of, inter alia, theft of intellectual property. (Compl., ¶¶ 52-53). Thus, it is clear from the amended complaint that plaintiffs probably discovered the purported conversion in September 1997 and, in no event, later than January 1998 when Thomas alleges that his mother refused to do business with the Town of Riverhead because it had allegedly misused Thomas's bid and plans for the Grumman property. (Compl., ¶ 53). Since plaintiffs' original complaint was not filed until November 2002, at least four years after plaintiffs discovered the alleged conversion of their plans and blueprints for the Grumman property, their conversion claims against Grubb & Ellis and O'Connor are time-barred. For the same reasons, to the extent plaintiffs state a conversion claim against the Town of Riverhead, Burman, First Industrial, Stark, Island Shore, Villella, Bowman, Lohneise, Cohen and the Twomey Latham defendants based upon the theft of

41

Thomas's "Hollywood Plan," those claims are dismissed as time-barred.

### iii.    Intentional Tort Claims

Grubb & Ellis contends that to the extent the amended complaint can be read to state claims for libel, slander, or other similar intentional tort, those claims are barred by a one year statute of limitations.  See N.Y. C.P.L.R. § 215(3).

In New York, the statute of limitations for intentional torts, including, *inter alia*, libel, slander, disparagement of character and intentional infliction of emotional distress, is one year. N.Y. C.P.L.R. § 215(3).  Since all of plaintiffs' allegations against Grubb & Ellis pertain to conduct of which they were aware no later than January 1998, to the extent plaintiffs seek to assert an intentional tort claim against Grubb & Ellis, those claims are dismissed as time-barred. Moreover, all of plaintiffs' other claims for intentional torts that relate to conduct of which they knew, or should have known, occurring prior to November 1, 2001, including plaintiffs' claims that John Langdon and Jones threatened Dianne with physical harm in February 2000, are dismissed as time-barred.

### iv.    Violations of the Truth in Lending Act, the Fair Debt Collection Practices Act and the Fair Credit Reporting Act

Grubb & Ellis contends, *inter alia*, that plaintiffs' claims for violations of the Truth In Lending Act and the Fair Debt Collection Practices Act and for a violation of the Fair Credit Reporting Act are barred by the one year and two year statute of limitations applicable to those

claims, respectively.[17] Grand Am contends that plaintiffs' claim that it refused to disclose the name of the lender who had approved them for credit occurred in April 1995 and, thus, plaintiffs' Truth in Lending Act claims against it are time-barred.

Claims alleging violations of the Truth in Lending Act (TILA), 15 U.S.C. §§ 1638, *et seq.*, must be commenced "within one year from the date of the occurrence of the violation." Claims alleging violations of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §§ 1692, *et seq.*, must also be commenced "within one year from the date on which the violation occurs." 15 U.S.C. § 1692k(d). Since plaintiffs' claims against Grubb & Ellis and O'Connor occurred in September 1997, to the extent plaintiffs seek to state a claim alleging a violation of the FDCPA or the TILA against those defendants, those claims are dismissed as time-barred.[18] Likewise, since the conduct of which plaintiffs complain with respect to Grand Am occurred in April 1995, their TILA claims against that defendant are also dismissed as time-barred.[19]

---

[17] Although plaintiffs do not specifically claim a violation of the FCRA in their amended complaint, since Grubb & Ellis addresses such a claim in its motion, I will address that claim as if specifically alleged.

[18] Moreover, the FDCPA only regulates the activities of debt collectors. See Howe v. Reader's Digest Ass'n, Inc., 686 F.Supp. 461, 466 (S.D.N.Y. 1988). "Debt collector" is defined as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). However, none of the entities against whom plaintiffs purportedly assert a claim under the FDCPA is a "debt collector" within the meaning of the statute. Accordingly, plaintiffs' FDCPA claims are dismissed sua sponte in their entirety for failure to state a cause of action.

[19] Moreover, the Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*, generally provides for the disclosure of credit and lease terms to consumers and prohibits inaccurate and unfair credit billing and credit card practices. The Act requires a creditor to disclose certain information relating to consumer credit transactions and prescribes civil liability for any creditor who fails to do so. Koons Buick Pontiac GMC, Inc. v. Nigh, 543 U.S. 50, 54, 125 S.Ct. 460, 160 L.Ed.2d

At the time plaintiffs commenced this action, the Fair Credit Reporting Act (FCRA) provided that an action arising under that statute must be commenced "within two years from the date on which the liability arises," 15 U.S.C. § 1681p[20], "subject to a single exception for cases involving a defendant's willful misrepresentation of material information." TRW Inc. v. Andrews, 534 U.S. 19, 28, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001). To the extent plaintiffs state a claim that Grubb & Ellis and O'Connor violated the FCRA, any such claim would be time-barred, as plaintiffs were aware of the conduct of which they complain with respect to those defendants no later than January 1998. Accordingly, any FCRA claim asserted against Grubb & Ellis and O'Connor is dismissed as time-barred.

---

389 (2004). Following the enactment of the Truth in Lending Simplification and Reform Act, Pub.L. No. 96-221, 94 Stat. 132, 168 (1980) (TILSRA), effective in 1982, "creditor" is defined, in relevant part, as "a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement." 15 U.S.C. § 1602(f); see Calica v. Independent Mortgage Bankers, Ltd., No. CV 88-0452, 1989 WL 117057, at * 1 (E.D.N.Y. Sept. 28, 1989). Moreover, TILA's implementing regulation, Regulation Z, defines "creditor" in relevant part as "[a] person (A) who regularly extends consumer credit that is subject to a finance charge or is payable by written agreement in more than 4 installments (not including a downpayment), and (B) to whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is no note or contract. 12 C.F.R. § 226.2(a)(17). The only defendants named in the amended complaint who can even arguably be said to be "creditors" within the meaning of the statute and its implementing regulation are North Fork, Fleetwood Credit and Key Bank. However, none of plaintiffs' allegations against North Fork, Fleetwood Credit or Key Bank state a violation of any of the provisions of TILA. Accordingly, plaintiffs' claims for violations of the TILA are dismissed sua sponte in their entirety.

[20] Section 1681p was amended in 2003 to provide for a different statute of limitations, not applicable here.

v.      Bivens Claim[21]

The FBI defendants allege that the Bivens claims against Fanning Sr., which occurred

more than thirty years ago, are time-barred.

For Bivens actions arising in New York, the statute of limitations is three years.  See

Tapia-Ortiz v. Doe, 171 F.3d 150, 151 (2d Cir. 1999); Kronisch v. U.S., 150 F.3d 112, 123 (2d

Cir. 1998).  Inasmuch as the only claims asserted against Fanning Sr. pertain to the Fanning

incident, which occurred in 1971, and since plaintiffs were aware of the claims for more than

three years prior to the date they filed their complaint, plaintiffs' claims against Fanning Sr. (their

first cause of action) are dismissed as time-barred.


3.      Section 1983 Claims[22]

a.      "Persons" Within Meaning of Section 1983

The State defendants contend that there is no claim against the State or the individual

State defendants in their official capacities under section 1983 because they are not "persons"

within the meaning of that statute.  The Teamsters defendants contend that plaintiffs' section

1983 claims against Local 817 fail because it is not considered a "person" within the meaning of

---

[21]  As noted more fully in part C(3)(g), infra, plaintiffs cannot assert a section 1983 claim against the FBI defendants, but may only bring an action under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

[22]  42 U.S.C. § 1983 provides, in pertinent part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress* * *."

the statute.

"[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983." Will v. Michigan Dept. of State Police, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); see also Huminski v. Corsones, 396 F.3d 53, 70 (2d Cir. 2005). "Therefore, state officials cannot be sued in their official capacities for retrospective relief under section 1983." Huminski, 396 F.3d at 70[23]. Accordingly, even if this Court has subject matter jurisdiction over plaintiffs' section 1983 claims against the State and the individual State defendants in their official capacities, those claims are dismissed with prejudice for failure to state a claim.[24]

However, contrary to the contention of the Teamsters defendants, labor unions are "persons" subject to liability under section 1983. See, e.g. Mehrhoff v. William Floyd Union Free School Dist., No. 04-CV-3850, 2005 WL 2077292, at * 4 (E.D.N.Y. Aug. 22, 2005)(stating that private persons such as a union can be held liable under section 1983 provided that they are found to have been acting under color of state law); Corrente v. State of R.I., Dept. of Corrections, 759 F.Supp. 73, 80-81 (D.R.I. 1991)(holding that the union was a "person" within the meaning of section 1983). The one case relied upon by the Teamsters defendants in support of their position that labor unions are not "persons" within the meaning of section 1983, Fitzpatrick v. Wert, 432 F.Supp. 601, 602 (W.D.N.Y. 1977), relied upon a Second Circuit case, Monell v. Department of Social Services of City of New York, 532 F.2d 259, 262-63 (2d Cir.

---

[23] Although state officials can be sued in their official capacities for injunctive or prospective relief, see Huminski, 396 F.3d at 70, plaintiffs seek only monetary damages in their amended complaint.

[24] State officials can be sued in their individual capacities for retrospective relief under section 1983. See Huminski, 396 F.3d at 70. Accordingly, plaintiffs' claims against the individual State defendants in their individual capacities are not dismissed on this basis.

46

1976), which held that municipalities and other local governmental units were not "persons" within the meaning of section 1983. However, Monell was subsequently reversed by the Supreme Court, which held that municipalities, municipal corporations and other local government units are "persons" to whom section 1983 applies. Monell v. Department of Social Services of City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Accordingly, the holding in Fitzpatrick is not good law. Therefore, this branch of the Teamsters defendants' motion is denied.

### b. Allegations of Wrongdoing

The State defendants, Grubb & Ellis, the Twomey Latham defendants, O'Connor and the Teamsters defendants contend that plaintiffs fail to identify with specificity any allegedly wrongful act committed by them.

Initially, although plaintiffs name the New York State Department of Consumer Affairs, the New York State Insurance Department, the Nassau County and Suffolk County Supreme Courts, Justices Baisley and Segal, the New York State Department of State, the New York State Division of Corporations, the New York State Department of Taxation and Finance, the Suffolk County Executive, the Suffolk County Department of Consumer Affairs, the Suffolk County Legislature, the Suffolk County Police Department, Third Precinct, the Suffolk County Police Internal Affairs Division, the Suffolk County Sheriff's Department, the Riverhead Town Supervisor, Specialized Insurance, and Wrenn Insurance in the caption, their amended complaint contains no specific factual allegations with regard to any of those entities. "[W]here the complaint names a defendant in the caption but contains no allegations indicating how the

47

defendant violated the law or injured the plaintiff, a motion to dismiss the complaint in regard to that defendant should be granted." Dove v. Fordham University, 56 F.Supp.2d 330, 335 (S.D.N.Y. 1999)(internal quotations and citations omitted), aff'd sub nom Dove v. O'Hare, 210 F.3d 354 (2d Cir. 2000)(table). Accordingly, the amended complaint is dismissed as against those defendants.

Moreover, although "a claim for relief under 42 U.S.C. § 1983 only need allege that some person acting under color of state law deprived the claimant of a federal right," Green v. Maraio, 722 F.2d 1013, 1016 (2d Cir. 1983), it is well-settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Back v. Hastings on Hudson Union Free School Dist., 365 F.3d 107, 122 (2d Cir. 2004)(internal quotations and citation omitted); see Sealey v. Giltner, 116 F.3d 47, 51 (2d Cir. 1997). Section 1983 claims that are unsupported by any factual allegations of personal involvement in wrongdoing by a particular defendant should also be dismissed.[25] See Alfaro Motors, Inc. v. Ward, 814 F.2d 883, 886 (2d Cir. 1987); see also Vazquez v. Parks, No. 02 Civ. 1735, 2003 WL 1442087, at * 8 (S.D.N.Y. Feb. 4, 2003), aff'd, 101 Fed.Appx. 365 (2d Cir. June 14, 2004)(holding that in order to survive a motion to dismiss, a plaintiff alleging a section 1983 or Bivens claim must set forth specific and detailed factual allegations of personal involvement as opposed to bald assertions and conclusory terms); Williams v. City of New York, No. 03 Civ.

---

[25] Like a section 1983 action, a Bivens action requires that a plaintiff allege that each defendant was personally involved in the alleged constitutional violation. See Barbera v. Smith, 836 F.2d 96, 99 (2d Cir. 1987). Since the personal requirement in a Bivens action is identical to that required in a section 1983 action, see Vazquez v. Parks, No. 02 Civ. 1735, 2003 WL 1442087, at * 8 (S.D.N.Y. Feb. 4, 2003), aff'd, 101 Fed.Appx. 365 (2d Cir. June 14, 2004), this analysis is equally applicable to plaintiffs' Bivens claims.

5342, 2005 WL 2862007, at * 3 (S.D.N.Y. Nov. 1, 2005)(holding that the personal involvement of a defendant must be pleaded with specific factual support and that a plaintiff's failure to plead such specificity in a section 1983 action will result in dismissal of the action).

Although plaintiffs name Tag Motors and the Suffolk County District Attorney in their first cause of action, they do not detail any factual allegations of personal involvement by those defendants in any constitutional violation. Plaintiffs only allege that Tag Motors was the site of a purported arson and that the Suffolk County District Attorney assigned particular detectives to investigate the arson and alleged fraud. Since plaintiffs do not allege any wrongdoing on the part of Tag Motors or the Suffolk County District Attorney in their first cause of action, that cause of action is dismissed in its entirety as against those defendants. Thomas v. Ashcroft, No. 02 Civ. 5746, 2004 WL 1444735, at *10 (S.D.N.Y. June 25, 2004) (dismissing the plaintiff's claims against three defendants where the complaint contained no allegations indicating how those defendants violated the law or injured the plaintiff, and against three other defendants based on the conclusory nature of the claims asserted against them); McCoy v. Goord, 255 F.Supp.2d 233, 257-258 (S.D.N.Y. 2003)(dismissing the plaintiff's claims against certain of the named defendants where the plaintiff did not plead any facts to suggest that those defendant were personally aware of or involved in any of the alleged constitutional violations).

Likewise, plaintiffs name Key Bank, Romaine and Governor Pataki in their second cause of action, but do not make any allegation of wrongdoing by those defendants. Accordingly, plaintiffs' second cause of action is dismissed as against Key Bank, Romaine and Governor Pataki. As plaintiffs do not refer to Governor Pataki anywhere else in the amended complaint, the complaint is dismissed in its entirety as against him.

Although plaintiffs name MBA and the DMV in their third cause of action, they do not make any specific allegations of wrongdoing by those defendants and, thus, the third cause of action is dismissed as against them. Furthermore, as plaintiffs do not refer to MBA anywhere else in their amended complaint, the complaint is dismissed in its entirety as against that defendant[26].

Similarly, although plaintiffs name Nancy Langdon in the fourth cause of action, they do not make any specific allegations of wrongdoing by her and, therefore, the fourth cause of action is dismissed as against Nancy Langdon. As plaintiffs do not make any other allegations of wrongdoing by Nancy Langdon in the amended complaint, the complaint is dismissed in its entirety as against her. Further, since the only claim against John Langdon containing a specific allegation of wrongdoing is dismissed as time-barred, see Part II(c)(2)(b)(iii), the amended complaint is dismissed in its entirety as against John Langdon as well.

However, and contrary to the contentions of Grubb & Ellis, O'Connor and the Twomey Latham defendants, construing all inferences in favor of plaintiffs, as is required on a motion to dismiss, the amended complaint can be read to allege that Grubb & Ellis and O'Connor participated, either directly or as part of a conspiracy, in the purported theft of Thomas's "Hollywood Plan," and that Grubb & Ellis, O'Connor and Twomey Latham, along with others, tricked Thomas into signing a release. Accordingly, plaintiffs' amended complaint arguably states, albeit barely, a cause of action against Grubb & Ellis, O'Connor and Twomey Latham. Therefore, these branches of Grubb & Ellis's, O'Connor's and Twomey Latham's motions to

---

[26] In light of this determination, it is unnecessary to consider MBA's remaining contentions in support of dismissal.

dismiss are denied.

Contrary to the contention of the Teamsters defendants, the amended complaint also sufficiently alleges their involvement in the tampering with plaintiffs' telephone lines and in the purported extortion of plaintiffs' clients. Accordingly, this branch of the Teamsters defendants' motion to dismiss is denied.

Likewise, there are sufficient allegations of wrongdoing with respect to the remaining State defendants to warrant denying this branch of the State defendants' motion to dismiss as well.

c.    Color of State Law

Great American, Grubb & Ellis, the Twomey Latham defendants, O'Connor and the Teamsters defendants contend that plaintiffs' section 1983 claims against them must be dismissed because plaintiffs have not alleged that they acted under color of state law.

To state a claim pursuant to 42 U.S.C. § 1983, a plaintiff must establish a deprivation of constitutional rights "under color of state law." See Briscoe v. LaHue, 460 U.S. 325, 329-330, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983); Sykes v. James, 13 F.3d 515, 519 (2d Cir. 1993). Section 1983 liability may only be imposed upon wrongdoers "who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it." National Collegiate Athletic Ass'n v. Tarkanian, 488 U.S. 179, 191, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988)(citation omitted). If a defendant's conduct satisfies the state action requirement under the Fourteenth Amendment, then that conduct also constitutes action "under color of" state law for purposes of § 1983. Brentwood Academy v. Tennessee Secondary School

<u>Athletic Ass'n</u>, 531 U.S. 288, 295 n. 2, 121 S.Ct. 924, 148 L.Ed.2d 807 (2001). When determining whether a person is a state actor sufficient to establish § 1983 liability, the court must consider (1) "the extent to which the actor relies on governmental assistance and benefits * * *; [2] whether the actor is performing a traditional government function * * *; and [3] whether the injury caused is aggravated in a unique way by the incidents of governmental authority." <u>LeBlanc-Sternberg v. Fletcher</u>, 67 F.3d 412, 433 (2d Cir. 1995).

The Twomey Latham defendants, Island Realty, Grubb & Ellis, O'Connor, First Industrial, Cohen, Burman, Grand Am, Fleetwood Credit, Complete RV, Tag Motors, Great American, Republic Western, Gomes, Rossi, Jones, the Langdons, Safari Motor Coach, and the Teamsters defendants are not "state actors" within the meaning of section 1983. <u>See</u>, <u>e.g.</u> <u>American Mfrs. Mut. Ins. Co. v. Sullivan</u>, 526 U.S. 40, 52, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999)(holding that private insurers, without more, are not state actors); <u>Ciambriello v. County of Nassau</u>, 292 F.3d 307, 323 (2d Cir. 2002)(holding that labor unions generally are not state actors); <u>Gambino v. Rubenfeld</u>, 179 F.Supp.2d 62, 69 (E.D.N.Y. 2002), <u>aff'd</u>, 48 Fed.Appx. 22 (2d Cir. 2002) (holding that a private attorney is not a state actor).

However, liability under § 1983 may be imposed upon private individuals who are not state actors (1) if there exists a "sufficiently close nexus between the State and the challenged action of the [private] entity so that the action of the latter may be fairly treated as that of the State itself" (commonly known as the "close nexus/joint action" test); (2) when the State "has exercised coercive power or had provided such significant encouragement, either overt or covert," that the action of the private entity must be deemed that of the State (commonly known as the "state compulsion" test); or (3) where the private entity "has exercised powers that are

52

traditionally the exclusive prerogative of the State" (commonly known as the "public function" test). Blum v. Yaretsky, 457 U.S. 991, 1004-1005, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982)(internal quotations and citations omitted). In addition, liability may also be imposed upon a private entity who is not a state actor if the private entity has conspired with or engaged in joint activity with state actors. See Spear v. Town of West Hartford, 954 F.2d 63, 68 (2d Cir. 1992); Elmasri v. England, 111 F.Supp.2d 212, 217 (E.D.N.Y. 2000); Puglisi v. Underhill Park Taxpayer Assoc., 947 F.Supp. 673, 703-704 (S.D.N.Y. 1996), aff'd, 125 F.3d 844 (2d Cir. 1997). Conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights, which are unsupported by any specific details of time and place, are insufficient to state a section 1983 conspiracy claim. See Ciambriello, 292 F.3d at 324; Perez v. Doe, 98 CV 5341, 2001 WL 370224, at * 2 (E.D.N.Y. Apr. 11, 2001).

Plaintiffs have failed to allege sufficient facts to satisfy any of the elements necessary to impose section 1983 liability upon the non-state actors named in the amended complaint under any of the three tests for state action. In addition, with the exception of plaintiffs claims against First Industrial, Burman, the Twomey Latham defendants, Grubb & Ellis, O'Connor and Fleetwood Credit, as set forth below, to the extent plaintiffs allege a conspiracy between any of the other non-state actor defendants and a state actor, their conclusory allegations against those defendants fail to indicate when, where, or how any of those defendants reached an agreement with a state actor to deprive them of their constitutional rights and, thus are insufficient to state a claim under section 1983. Since plaintiffs have failed to demonstrate that Island Shore Realty, Cohen, Grand Am, Complete RV, Tag Motors, Great American, Republic Western, Gomes, Rossi, Jones, Safari Motor Coach and the Teamsters defendants were performing as, or

conspiring with, a state actor, plaintiffs' section 1983 claims against those defendants are dismissed in their entirety for failure to state a claim[27].

### d. Conspiracy Claims

Fleetwood Credit contends that plaintiffs' section 1983 claim against it, alleging that it acted with the DMV and Titles Bureau to deprive them of the use of a 1989 Sportcoach recreational vehicle, should be dismissed because it "fails to state supporting operative facts showing agreement and concerted action among Fleetwood Credit, the DMV and the Titles Bureau." (Affirmation of Lance Perez in Support of Motion to Dismiss, ¶6). Grubb & Ellis, the Twomey Latham defendants and O'Connor contend that absent any facts of an agreement, any overt act in furtherance of any agreement, any intentional participation in the alleged agreement, or any harm resulting therefrom, plaintiffs' conclusory allegations of a conspiracy, are insufficient to establish a cause of action for conspiracy under section 1983.

In order to survive a motion to dismiss a section 1983 conspiracy claim, a plaintiff must allege "(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." Ciambriello, 292 F.3d at 324-325. "[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." Id. at 325 (internal quotations and citation

---

[27] In light of this determination, it is unnecessary to consider the remaining contentions of these non-state actor defendants with respect to plaintiffs' section 1983 claims.

omitted)[28]. A complaint that is devoid of any details of time and place or the factual basis necessary to enable the defendants intelligently to prepare their defense, should be dismissed. Id.

Liberally read, the amended complaint states the following claims of conspiracy: (1) that Fleetwood Credit, Grand Am, Complete RV and Tag Motors had an agreement to defraud plaintiffs of their equity in the Sports Coach motor home; (2) that Bowman and Kanas had a meeting at an unidentified time and place to have Kanas provide Bowman and the Town of Riverhead with information about plaintiffs' business and clients; (3) that North Fork conspired with other unidentified defendants to destroy plaintiffs' credit, income, reputation and business; (4) that Stark, Villella, Bowman, Lohneise, First Industrial and Burman conspired to steal plaintiffs' plans and blueprints relating to the "Hollywood Plan;" (5) that Key Bank, Gomes, Rossi, Great American and Tag Motors conspired to defraud plaintiffs of title to their motor homes; (6) that the Teamsters defendants conspired with Gomes to extort money from plaintiffs; (7) that Fleetwood Credit conspired with the DMV and Titles Bureau to deprive them of their use

---

[28] The Second Circuit has not yet considered whether these pleading requirements for conspiracy allegations remain valid in light of two Supreme Court decisions, Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), and Swierkiewicz v. Sorema N.A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). See, e.g. Toussie v. Powell, 323 F.3d 178, 185, n. 3 (2d Cir. 2003)(declining to consider the continued viability of the pleading requirements for conspiracy claims after Leatherman and Swierkiewicz). Both of those decisions rejected heightened pleading requirements in certain cases, albeit not in civil rights conspiracy cases, in favor of Rule 8(a)(2)'s liberal "notice pleading" requirement. Id. However, courts in this district have consistently followed the Ciambriello standard to the pleading requirements for federal conspiracy claims subsequent to Swierkiewicz, presumably pending a definite resolution of this issue by the Second Circuit. See, e.g. Campbell v. New York City Police, No. 05 CV 2858, 2005 WL 1970954, at * 2 (E.D.N.Y. Aug. 10, 2005); Straker v. Metropolitan Transit Authority, 333 F.Supp.2d 91, 99-102 (E.D.N.Y. 2004); see also Kramer v. City of New York, No. 04 Civ. 106, 2004 WL 2429811, at * 7 (S.D.N.Y. Nov. 1, 2004).

of their motor home; and (8) that the Twomey Latham defendants, the Town of Riverhead, Grubb & Ellis, O'Connor and Kelly conspired to trick plaintiffs into signing a release of their civil claims against those defendants some time between February 1998 and August 1998. Of these allegations, only the second, fourth, seventh and eighth claims could even arguably state a conspiracy claim under section 1983 because the remaining claims allege only conspiracies between private parties. Accordingly, to the extent plaintiffs seek to assert section 1983 conspiracy claims against Grand Am, Complete RV, Tag Motors, North Fork, Key Bank, Gomes, Rossi, Great American and the Teamsters defendants, those claims are dismissed.

In addition, plaintiffs' claim that Bowman, a Town of Riverhead official, and Kanas met at an unspecified time and place fails to allege that those parties actually agreed to inflict an unconstitutional injury upon plaintiffs, or that either party committed an overt act in furtherance of any such agreement. Accordingly, to the extent plaintiffs allege a section 1983 conspiracy claim against Bowman and Kanas relating to that meeting, those claims are dismissed for failure to state a cause of action.

Moreover, plaintiffs' conclusory claim that Fleetwood Credit conspired with the DMV and the Titles Bureau to deprive them of their property interest in their motor home is devoid of any details. Accordingly, plaintiffs' section 1983 conspiracy claim is dismissed as against Fleetwood Credit.

However, plaintiffs' claims that between September 1997 and November 2001, Stark, Villella, Bowman and Lohneise, who were, at all relevant times, officials of the Town of Riverhead, conspired with First Industrial and Burman to steal Thomas's plans and blueprints relating to his "Hollywood Plan," are sufficient to state a section 1983 conspiracy claim against

56

those defendants. Accordingly, plaintiffs' section 1983 conspiracy claims against those defendants remain.

Likewise, and contrary to the contention of the Twomey Latham defendants, Grubb & Ellis and O'Connor, plaintiffs' allegations that at a "preliminary closing" sometime in August 1998 or thereafter, those defendants and the Town of Riverhead tricked him into signing a release of all civil claims that he may have against them, sufficiently alleges an agreement between private parties and a state actor to deprive plaintiffs of their property right in a potential civil action and an overt act on the part of at least one of those defendants in procuring plaintiffs' signatures on the release. Accordingly, the branches of those defendants' motions which are to dismiss plaintiffs' section 1983 conspiracy claims against them are denied.

e.    Section 1983 Claims against the FBI Defendants

The FBI defendants contend that since they were acting under color of federal law, not state law, plaintiffs cannot assert a section 1983 claim against them, but may only bring an action under Bivens. The FBI defendants further contend, *inter alia*, that even deeming plaintiffs' claims against them to be brought pursuant to Bivens, plaintiffs' allegations against them do not constitute constitutional violations. According to the FBI defendants, the only allegations against Fanning Jr. and Grupe[29] are that they failed to investigate plaintiffs' complaint of fraud and there is no constitutional right to an investigation.

In Bivens, the Supreme Court created a cause of action to recover money damages from

---

[29] Since plaintiffs' Bivens claim against Fanning Sr. is dismissed as time-barred, it is not necessary to consider the FBI defendants' remaining contentions on his behalf.

57

federal officials for a violation of constitutional rights. See King v. Simpson, 189 F.3d 284, 287 (2d Cir. 1999); Jones v. New York State Division of Military and Naval Affairs, 166 F.3d 45, 50 (2d Cir. 1999). However, a Bivens claim cannot be asserted for money damages against a federal agency. See F.D.I.C. v. Meyer, 510 U.S. 471, 485-486, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994) (declining to extend Bivens to agencies of the federal government); Conklin, 2002 WL 227067, at * 4 (holding that Bivens does not create a cause of action against the FBI for constitutional torts committed by its agents). Accordingly, plaintiffs' section 1983 claims against the FBI are dismissed with prejudice for failure to state a claim. See, e.g. Conklin, 2002 WL 227067, at * 4 (holding that a section 1983 claims cannot lie against the FBI). Plaintiffs section 1983 claims against Fanning Jr. and Grupe, however, will be deemed to be Bivens claims.

There is no constitutional right to an investigation by government officials. See Bal v. City of New York, No. 94 Civ. 4450, 1995 WL 46700, at * 2 (S.D.N.Y. Feb. 7, 1995), aff'd, 99 F.3d 402 (2d Cir. 1995)(table) (holding that there is no constitutional right to an investigation by government officials; see also Town of Castle Rock, Colo. v. Gonzales, 125 S.Ct. 2796, 2810, 162 L.Ed.2d 658 (2005) (holding that the benefit that a third party may receive from having someone else arrested for a crime generally does not trigger protections under the Due Prcoess Clause); Perez v. City of New York, No. 97 CV 2915, 1998 WL 564551, at * 1 (E.D.N.Y. June 18, 1998) (finding that no court has recognized inadequate investigation as sufficient to state a civil rights claim unless there was another recognized constitutional right involved); Johns v. Town of East Hampton, 942 F.Supp. 99, 107-108 (E.D.N.Y. 1996) (finding that the complaint failed to plead a claim for a violation of procedural due process in connection with the defendants' manner of handling complaints). Since plaintiffs' claim that Fanning Jr. and Grupe

failed to investigate their complaints of fraud did not deprive them of a recognized constitutional right, their <u>Bivens</u> claims against those defendants are dismissed for failure to state a cause of action.

### 4. Immunity from Suit

#### a. Qualified Immunity

The FBI defendants contend that the individual FBI defendants are also entitled to qualified immunity from suit because it is not alleged that they violated a clearly established statutory or constitutional right and even if such a right existed, it was objectively reasonable for a law enforcement officer to believe that the acts alleged in the amended complaint did not violate such a right. The Town of Brookhaven defendants contend that Grucci is entitled to qualified immunity since plaintiffs' only specific allegation against him is that, in his official capacity, he authorized code enforcement officers to act.

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); <u>see</u> <u>also</u> <u>Holcomb v. Lykens</u>, 337 F.3d 217, 220 (2d Cir. 2003)(citing <u>Weyant v. Okst</u>, 101 F.3d 845, 857 [2d Cir. 1996]) (holding that pursuant to the doctrine of qualified immunity, "public officials are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights"); <u>Catletti ex rel. estate of Catletti v. Rampe</u>, 334 F.3d 225, 228 (2d Cir. 2003)(accord). In order to defeat a

qualified immunity defense, the plaintiff "must allege a deprivation of an actual constitutional

right clearly established at the time of the events in issue." Holcomb, 337 F.3d at 220. The

threshold inquiry in a qualified immunity analysis is whether the facts alleged rise to the level of

a deprivation of a constitutional right. Moore v. Vega, 371 F.3d 110, 114 (2d Cir. 2004);

Catletti, 334 F.3d at 228. If so, the court must next determine whether that right was clearly

established at the time of the alleged violation. Catletti, 334 F.3d at 228; Genas v. State of N.Y.

Dept. of Correctional Services, 75 F.3d 825, 830 (2d Cir. 1996).

        i.      Violation of a Clearly Established Constitutional Right

To determine whether a right was clearly established, a court must consider (1) whether

the right was defined with "reasonable specificity"; (2) whether the relevant decisional law

supports the existence of the right in question; and (3) whether under preexisting law a

reasonable defendant would have understood that his or her acts were unlawful. Kantha v. Blue,

262 F.Supp.2d 90, 106 (S.D.N.Y. 2003). "For a constitutional right to be clearly established, its

contours must be sufficiently clear that a reasonable official would understand that what he is

doing violates that right. This is not to say that an official action is protected by qualified

immunity unless the very action in question has previously been held unlawful; but it is to say

that in the light of pre-existing law the unlawfulness must be apparent." Hope v. Pelzer, 536

U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)(internal quotations and citations

omitted); see also Moore v. Vega, 371 F.3d 110, 114 (2d Cir. 2004) (holding that the

unlawfulness of the officials' actions must be apparent to support a viable claim). "Officials can

still be on notice that their conduct violates established law even in novel factual circumstances."

<u>Hope</u>, 536 U.S. at 741, 122 S.Ct. 2508. The salient question is whether the state of the law at the time of the challenged acts gave defendants fair warning that their alleged treatment of plaintiff was unconstitutional. <u>Id.</u> "Only Supreme Court and Second Circuit precedent existing at the time of the alleged violation is relevant in deciding whether a right is clearly established." <u>Moore</u>, 371 F.3d at 114.

As previously noted, <u>supra</u>, there is no constitutional right to an investigation by government officials. Since plaintiffs' claims that Fanning Jr., Grupe and Grucci failed to investigate their various complaints do not allege a deprivation of an actual constitutional right clearly established at the time of the events at issue, those defendants are entitled to qualified immunity from plaintiffs' claims. Since plaintiffs do not allege any other conduct on the part of Fanning Jr. and Grupe, the amended complaint is dismissed in its entirety as against those defendants based on the doctrine of qualified immunity. In addition, plaintiffs' claim that Grucci failed to investigate their complaint is likewise dismissed based on the doctrine of qualified immunity.

Plaintiffs' allegation that Grucci authorized officers of the Town of Brookhaven Civil Code Enforcement to act also does not implicate a clearly established constitutional or statutory right. As this is the only remaining claim against Grucci, and the only claim against the Town of Brookhaven and the Civil Code Enforcement, the claims against those defendants are dismissed based on the doctrine of qualified immunity.

b.      Absolute Immunity

The State defendants contend that Justices Baisley and Segal are absolutely immune from

suit.

Judges are absolutely immune "from liability for damages for acts committed within their judicial jurisdiction * * * even when the judge is accused of acting maliciously and corruptly * * *." Pierson v. Ray, 386 U.S. 547, 554, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); see also Mireles v. Waco, 502 U.S. 9, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991)(holding that generally, a judge is immune from a suit for money damages)[30]. "[J]udicial immunity is an immunity from suit, not just from the ultimate assessment of damages." Mireles, 502 U.S. at 11, 112 S.Ct. 286. "A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the clear absence of all jurisdiction." Stump v. Sparkman, 435 U.S. 349, 356-357, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978); see also Mireles, 502 U.S. at 11, 112 S.Ct. 286 (holding that judicial immunity is not overcome by allegations of bad faith or malice). The mere disagreement with the action taken by the judge does not warrant depriving him or her of judicial immunity. See Stump, 435 U.S. at 363, 98 S.Ct. 1099. Rather, a judge will be deprived of judicial immunity only (1) for non-judicial actions, i.e., actions that were not taken in the judge's judicial capacity; or (2) for actions taken in the complete absence of all jurisdiction, even if judicial in nature. Mireles, 502 U.S. at 11-12, 112 S.Ct. 286; see also Tucker v. Outwater, 118 F.3d 930, 933 (2d Cir. 1997)(accord). The factors to consider in determining whether an act by a judge is judicial in nature are "whether it is a function normally performed by a judge, and to the

---

[30] Although judicial immunity does not bar prospective injunctive relief against a judicial officer acting in his judicial capacity, see Pulliam v. Allen, 466 U.S. 522, 541-542, 104 S.Ct. 1970, 80 L.E.2d 565 (1984), plaintiffs do not seek any such relief as against Justices Baisley and Segal.

expectations of the parties, i.e., whether they dealt with the judge in his judicial capacity."

Stump, 435 U.S. at 362, 98 S.Ct. 1099.

Plaintiffs do not allege that Justices Baisley and Segal acted in a non-judicial capacity, or that they acted in the complete absence of all jurisdiction. Accordingly, plaintiffs' claims against Justices Baisley and Segal are barred by the doctrine of judicial immunity and the amended complaint is dismissed in its entirety as against them.

### 5. Claims against Kanas and North Fork

#### a. Claims against Kanas

Kanas, the President of North Fork, claims that the only allegation against him, that he was seen at the airport with Bowman, a Town of Riverhead official, and that Bowman allegedly asked him to get any information he could about plaintiffs' business and its clients, is too broad and vague to state a cause of action against him. Kanas further contends that to the extent plaintiffs are alleging that he wrongfully provided plaintiffs' client list to Bowman, such an assertion does not allege a violation of any law, contract or bank policy.

The only possible claims that can be discerned from plaintiffs' allegations against Kanas are claims for conspiracy and for violations of the Right to Financial Privacy Act (RFPA), 12 U.S.C. §§ 3401-3422. For the reasons set forth above in part (C)(3)(d), supra, plaintiffs fail to state a viable conspiracy claim against Kanas. Moreover, plaintiffs cannot state a claim for a violation of the RFPA against Kanas. Section 3403(a) of the RFPA provides:

> "No financial institution, or officer, employees, or agent of a financial institution, may provide to any Government authority access to or copies of, or the information contained in, the financial records of any customer except in

accordance with the provisions of this chapter." (Emphasis added).

Section 3401(3) defines "Government authority" as used in the RFPA to mean "any agency or department of the United States, or any officer, employee, or agent thereof." Since Bowman was a local official of the Town of Riverhead, and not an officer of the United States, plaintiffs cannot state a claim for a violation of the RFPA against Kanas. See, e.g. U.S. v. Zimmerman, 957 F.Supp. 94, 96 (N.D.W.Va. 1997)(holding that the RFPA does not apply to state and local governments or to private parties and that the scope of the statute is limited to officials of Federal agencies and departments and to employees of the United States); Donahue v. Gavin, No. Civ. A. 98-1602, 1999 WL 165700, at * 7 (E.D.Pa. Mar. 12, 1999)(holding that the plaintiffs failed to state a cause of action pursuant to the RFPA where they did not allege that federal authorities had any role in the conduct giving rise to the RFPA claims).

Moreover, section 3401(5) defines "customer" as used in the RFPA, in relevant part, to mean "any person * * * who utilized or is utilizing any service of a financial institution * * *, in relation to an account maintained in the person's name." (Emphasis added). Section 3401(4) defines "person" as "an individual or a partnership of five or fewer individuals." To the extent plaintiffs allege that Kanas unlawfully provided information about the business account of A*Longi Productions and its clients, they fail to state a cause of action for a violation of the RFPA since A*Longi Productions is a corporation and, thus, is not a "person" within the meaning of the statute. See, e.g. U.S. v. Daccarett, 6 F.3d 37, 51 (2d Cir. 1993)(holding that corporations are not protected under the RFPA).

In addition, the RFPA imposes civil liability only upon "[a]ny agency or department of

the United States or financial institution," 12 U.S.C. § 3417(a), and does not impose civil liability upon the individual officers, employees or agents of a financial institution. See Liffiton v. Keuker, 850 F.2d 73, 78-79 (2d Cir. 1988)(affirming dismissal of plaintiffs' claims against the bank employee defendants on the basis that the RFPA does not impose civil liability upon individual employees of financial institutions). Accordingly, plaintiffs' cannot state a claim against Kanas for a violation of the RFPA.

b.     Claims against North Fork

North Fork contends that plaintiffs' broad allegations against it do not support a finding of wrongdoing and are insufficient as a matter of law to afford plaintiffs relief.

To the extent plaintiffs allege that North Fork violated that RFPA when it purportedly released or used their credit information to others, that claim must be dismissed for substantially the same reasons as set forth in part (C)(5)(a), supra.

Moreover, insofar as plaintiffs' allegations that large sums of money were missing from the A*Longi Productions business account; that North Fork bounced a check from A*Longi Productions to an equipment supplier; and that North Fork wrongfully took money from the A*Longi Productions account to setoff their home equity line of credit, and did so in such a manner as to cause potential customers to perceive A*Longi Productions as having no working capital, may liberally be read to state causes of action for, inter alia, wrongful dishonor and wrongful setoff, plaintiffs do not have standing to assert such causes of action on behalf of A*Longi Productions. See, e.g. Jones v. Niagara Frontier Transportation Authority, 836 F.2d 731, 736 (2d Cir. 1987) (holding that even the sole shareholder of a corporation does not have

65

standing to assert claims alleging wrongs to the corporation); Gianascio v. Giordano, No. 99 CV 1796, 2003 WL 22999454, at * 6 (S.D.N.Y. Dec. 19, 2003)(holding that even a sole shareholder lacks standing to assert claims alleging a wrong to the corporation unless he or she can demonstrate that the defendant breached a duty owing to him or her independent of any duty to the corporation); Colon v. Maddalone, No. 95 Civ. 0008, 1996 WL 556924, at * 3 (S.D.N.Y. Oct. 1, 1996) (holding that an individual plaintiff cannot bring a claim for damages suffered by a corporation, notwithstanding that the plaintiff owns all the stock in the corporation, faces the risk of financial loss, or suffers personal losses as a result of the harm to the corporation).  Having availed themselves of the benefits of conducting business as a corporation, plaintiffs cannot now disregard the corporate form merely because it has become convenient for them to do so.  See Gianascio, 2003 WL 22999454, at * 6.  Since none of the aforementioned allegations against North Fork plead any duty owed to plaintiffs independent of any duty owed to A*Longi Productions, those claims must be dismissed.  See, e.g. Colon, 1996 WL 556924, at * 3 (holding that the plaintiff lacked standing to maintain an action challenging the levies upon a corporation's bank account).

Furthermore, to the extent plaintiffs seek to assert a claim against North Fork for tortious interference with prospective economic advantage, the amended complaint fails to state a cause of action.  In order to state a claim for tortious interference with prospective economic advantage under New York law, a plaintiff must allege (1) that he or she had a business relationship with a third party existing at the time of the defendant's interference; (2) that the defendant knew of such relationship and intentionally interfered with it; (3) that the defendant acted solely with a wrongful purpose, i.e. malice, or used dishonest, unfair or improper means; and (4) that the

66

defendant's conduct injured the plaintiff's business relationship with the third party. Lombard v. Booz-Allen & Hamilton, Inc., 280 F.3d 209, 214 (2d Cir. 2002); Henneberry v. Sumitomo Corp. of America, 415 F.Supp.2d 423, 467-468 (S.D.N.Y. 2006). Moreover, the conduct constituting the tortious interference must be directed, at least in part, towards the third party, not just at the plaintiff himself. Carvel Corp. v. Noonan, 3 N.Y.3d 182, 192, 785 N.Y.S.2d 359, 818 N.E.2d 1100 (2004). The wrongful interference element requires conduct amounting to a crime or an independent tort, or engaged in solely to inflict intentional harm on the plaintiff. Henneberry, 415 F.Supp.2d at 468 (citing Carvel, 3 N.Y.3d 182, 785 N.Y.S.2d 359). Plaintiffs' only allegation against North Fork relevant to any claim for tortious interference with prospective economic advantage is that between 1998 and August 2000, North Fork allowed their home equity line of credit to fall delinquent by several months and then transferred deposits from their business accounts into their personal accounts which permitted unidentified creditors to perceive their business as having no working capitol. Plaintiffs do not allege that they had a business relationship with any third party that existed at the time of any purported interference by North Fork or that North Fork know of any such relationship and intentionally interfered with it. Accordingly, to the extent plaintiffs seek to assert a claim for tortious interference with prospective economic advantage against North Fork, that claim is dismissed for failure to state a cause of action. See, e.g. Henneberry, 415 F.Supp.2d at 468-469 (denying plaintiff's motion for leave to amend to assert a cause of action for tortious interference with prospective economic advantage where plaintiff failed to claim that he had a continuing or existing business relationship with a third party with which the defendant interfered).

Plaintiffs' remaining allegations against North Fork are overly broad and vague.

Accordingly, the amended complaint is dismissed in its entirety as against North Fork[31].

### 6.    Fraud Claims

#### a.    Fed. R. Civ. P. 9(b)[32]

Kanas and Republic Western move pursuant to Rule 9(b) to dismiss plaintiffs' fraud and fraudulent representation claims for failure to plead those claims with sufficient particularity. Fed. R. Civ. P. 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

In order to state a claim for fraud under New York law, the plaintiff must allege (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) causing injury to the plaintiff. Wynn v. AC Rochester, 273 F.3d 153, 156 (2d Cir. 2001). While Rule 9(b) requires that the actual fraud be pleaded with particularity, the requisite intent of the defendant "need not be alleged with great specificity." Wight v. BankAmerica Corp., 219 F.3d 79, 91 (2d Cir. 2000). However, the plaintiff must plead sufficient facts giving rise to a

---

[31] In light of this determination, it is unnecessary to consider North Fork's remaining contentions in support of dismissal.

[32] "By its terms, Rule 9(b) does not explicitly provide for a dismissal motion." Patel v. Contemporary Classics of Beverly Hills, 259 F.3d 123, 125, n. 4 (2d Cir. 2001). Rather, a motion to dismiss for failing to comply with the heightened pleading requirement of Rule 9(b) should be construed as a motion to dismiss pursuant to Rule 12(b)(6). See, e.g. Id.; Peirez, Ackerman & Levine v. Starr, No. 92 Civ. 7958, 1994 WL 48811, at * 3 (S.D.N.Y. Feb. 17, 1994)(holding that motions to dismiss under Rule 9[b] are submitted to the same standard as those under Rule 12[b][6]). Accordingly, I will apply the standard of review applicable to motions to dismiss under Rule 12(b)(6).

strong inference that the defendant had an intent to defraud, had knowledge of the falsity, or acted with a reckless disregard for the truth. Connecticut Nat. Bank v. Fluor Corp., 808 F.2d 957, 962 (2d Cir. 1987). Speculative and conclusory allegations of intent are insufficient. Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y., 375 F.3d 168, 187 (2d Cir. 2004).

Plaintiffs' claim against Kanas, that he attended a meeting with Bowman at an unspecified time, during which Bowman allegedly asked him to gather information about A*Longi Productions from its bank accounts at North Fork, fails to plead any underlying wrong committed by Kanas with the requisite particularity. Therefore, any fraud claim against Kanas is dismissed in its entirety. Since plaintiffs do not plead any other viable claim against Kanas, the amended complaint is dismissed in its entirety as against him.

Plaintiffs' allegations against Republic Western likewise fail to state a claim for fraud. In order to state a claim for fraudulent misrepresentation under New York law, a plaintiff must allege (1) that the defendant made a material false representation; (2) with the intent to defraud the plaintiff thereby; (3) that the plaintiff reasonably relied upon that representation; and (4) damages resulting therefrom. Eternity Global, 375 F.3d at 186-187; see also Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank, 57 F.3d 146, 153 (2d Cir. 1995). In addition, to establish a fraudulent concealment claim, the plaintiff must also show that the defendant had an affirmative duty to disclose the material information. See, Banque Arabe, 57 F.3d at 153; Canpartners Investments IV, LLC v. Alliance Gaming Corp., 981 F.Supp. 820, 825 (S.D.N.Y. 1997). Pursuant to Rule 9(b), a plaintiff is required to (1) detail the statements or omissions alleged to be fraudulent; (2) identify the speaker; (3) state where and when the

statements or omissions were made; and (4) explain why the statement or omissions are fraudulent. Eternity Global, 375 F.3d at 187; Harsco Corp. v. Segui, 91 F.3d 337, 347 (2d Cir. 1996). Since plaintiffs fail to specify, *inter alia*, the time, place and speaker of the alleged misrepresentation, they fail to state a claim for fraudulent misrepresentation against Republic Western. See, e.g. Olsen v. Pratt & Whitney Aircraft, Div. of United Technologies Corp., 136 F.3d 273, 275 (2d Cir. 1998)(dismissing the plaintiff's allegations of fraud as conclusory and lacking in particulars where he did not specify what was said, who said it, where and when the statements were said, or why the statements were fraudulent); Luce v. Edelstein, 802 F.2d 49, 54 (2d Cir. 1986) (holding that allegations which fail to specify the time, place and speaker of the alleged misrepresentation lacked the specificity required by Rule 9[b]). Moreover, plaintiffs do not allege that Republic Western had an affirmative duty to disclose its purported relationship to Great American. Accordingly, plaintiffs fail to state a claim for fraudulent concealment against Republic Western as well.

Plaintiffs' claim against Key Bank, that it knowingly profited from the fraud allegedly perpetrated by Great American, Rossi and Tag Motors, also fails to state a claim for fraud with the particularity required by Rule 9(b). To the extent that claim seeks to assert a cause of action for aiding and abetting fraud, it is likewise dismissed for failure to state a claim. In order to state a claim for aiding and abetting fraud under New York law, a plaintiff must allege "(1) the existence of the primary fraud, (2) the aider and abettor's knowledge of the fraud, and (3) substantial assistance by the aider and abettor." Banks v. Consumer Home Mortgage, Inc., No. 01-CV-8508, 2003 WL 21251584, at * 5 (E.D.N.Y. Mar. 28, 2003)(internal quotations and citation omitted). Since plaintiffs do not allege that Key Bank provided any assistance to Great

American, Rossi or Tag Motors in the perpetration of those defendants' alleged fraud, plaintiffs do not state a claim for aiding and abetting fraud as against Key Bank. Since plaintiffs do not allege any other viable claim against Key Bank, the amended complaint is dismissed in its entirety as against that defendant.

Moreover, since plaintiffs have already been afforded an opportunity to amend their complaint, their fraud claims against Kanas, Republic Western and Key Bank are dismissed with prejudice. See Luce, 802 F.2d 49 (holding that leave to amend may be denied when the plaintiff has already been afforded one opportunity to replead his or her claim).

### 7. Claims against the Town of Riverhead

The Town of Riverhead contends that plaintiffs' claim that they filed a mechanic's lien on the Grumman property is without merit because (1) there was no basis for the filing; and (2) they would have had to perfect their claim within one (1) year of its filing, which was December 20, 2001.

Initially, it bears noting that according to plaintiffs' allegations in, and Exhibit V annexed to, the amended complaint, they filed the lien on December 20, 2001, after the sale of the industrial core of the Grumman property to Burman in November 2001. Accordingly, to the extent they allege that the sale of the industrial core interfered with a property interest in violation of their due process rights, such contention is clearly without merit, since they had no property interest existing at the time of that sale.

Assuming, without deciding, that plaintiffs had a valid and enforceable lien under New York Lien Law §§ 2(4) and 3 when they filed it on December 20, 2001, compare Windsor Metal

Fabrications, Ltd. v. Reynolds Metal Development, Co., 262 A.D.2d 404, 405, 689 N.Y.S.2d 658 (2d Dept. 1999)(affirming dismissal of the plaintiff's cause of action to foreclose a mechanic's lien since the construction drawings on which the lien was based were not prepared by an architect, engineer or surveyor, as required under New York Lien Law § 2[4]), with Bralus Corp. v. Berger, 307 N.Y. 626, 627, 120 N.E.2d 829 (1954)(affirming denial of motion for summary dismissal of the respondent's mechanic's lien, filed for making drawings of preliminary plans and allied architectural services since mechanic's liens may be filed for materials furnished or labor performed for the improvement of real property, including the drawing by an architect, engineer or surveyor of any plans or specifications or survey); Di-Com Corp. v. Active Fire Sprinkler Corp., 36 A.D.2d 20, 21, 318 N.Y.S.2d 249 (1st Dept. 1971)(reversing order granting petition to discharge notice of mechanic's lien where the identity of the person preparing the plans, specifications or surveys on an improvement did not appear on the face of the lien, since it could not be ascertained whether the plans were prepared by an architect, engineer or surveyor, which would be lienable), pursuant to N.Y. Lien Law § 21(2), the lien was discharged when one year had elapsed since the filing of the notice of lien because plaintiffs did not seek an extension thereof or commence an action to foreclose the lien within one year as prescribed by N.Y. Lien Law § 18. Although plaintiffs allege that the County of Suffolk announced that it intended to sell the remaining portions of the property in September 2002, they do not allege that the County in fact sold the property, or otherwise interfered with plaintiffs' arguable property interest in the property, prior to the time the lien was discharged by operation of law. Accordingly, plaintiffs' claims pertaining to their mechanic's lien are dismissed for failure to state a claim. Since plaintiffs' only allegation against Romaine pertains to the filing of the mechanic's lien, the

amended complaint is dismissed in its entirety as against him.

### 9. Claims against Grubb & Ellis[33]

Grubb & Ellis contends that plaintiffs cannot state a claim for misappropriation since "their" ideas regarding the proposed use of the Grumman property had been mentioned in newspaper articles prior to the date plaintiffs claim to have met with the Town of Riverhead and, therefore, were not novel and are not protectable under New York law.

In order to state a misappropriation of property claim under New York law, a plaintiff must allege "the taking of an idea that is original or novel in absolute terms, because the law of property does not protect against the misappropriation or theft of that which is free and available to all." Nadel v. Play-by-Play Toys & Novelties, Inc., 208 F.3d 368, 378 (2d Cir. 2000)[34]; see also Ring v. Estee Lauder, Inc., 874 F.2d 109, 110, n. 1 (2d Cir. 1989) (stating that New York requires a protectable idea to be both novel and original); Ferber v. Sterndent Corp., 51 N.Y.2d 782, 783-784, 433 N.Y.S.2d 85, 412 N.E.2d 1311 (1980)(holding that absent a showing of novelty, plaintiff's action to recover damages for illegal use of "confidentially disclosed ideas"

---

[33] According to counsel for Grubb & Ellis, it was originally retained to represent both Grubb & Ellis and its employee, Richard Seeler, s/h/a Richard Seiler. However, Mr. Seeler has since died and Grubb & Ellis have filed a suggestion of death as to him.

[34] In contrast, a submission-of-ideas case based on a breach of contract theory, as opposed to a misappropriation of property theory, under New York law requires only a showing that the idea was novel to the particular buyer, as opposed to being original or novel generally. See Nadel, 208 F.3d at 376-378, 380; Apfel v. Prudential-Bache Securities Inc., 81 N.Y.2d 470, 600 N.Y.S.2d 433, 616 N.E.2d 1095 (1993). However, plaintiffs do not allege the existence of an express contract and do not allege any of the elements required to establish an implied-in-fact contract. See Nadel, 208 F.3d at 376, n. 5 (stating that an implied-in-fact contract requires consideration, mutual assent, legal capacity and legal subject matter). Accordingly, plaintiffs' submission-of-idea claim may only be read as a misappropriation of property claim.

must fail as a matter of law). Some of the factors to be considered in determining whether an idea is original or novel include whether it is a generic concept or one of specific application; how many people knew of the idea; how different the idea is from generally known ideas; and how widespread the idea's use is in the industry. Nadel, 208 F.3d at 378.

The newspaper articles annexed to plaintiffs' amended complaint, and thus, properly considered on this motion to dismiss, indicate that Thomas's "Hollywood Plan" already existed in the public domain prior to any of their meetings with Stark, O'Connor, Island Realty, Grubb & Ellis, Villella, Bowman, Lohneise, First Industrial, Cohen and the Twomey Latham defendants and, thus, was not original or novel at the time of those meetings in September 1997 and thereafter. Accordingly, plaintiffs cannot state a misappropriation of property claim against any of those defendants and those claims are, therefore, dismissed.


### a. Dianne's claims

Grubb & Ellis contend that Dianne's claims must be dismissed because she did not sign the amended complaint and the statement that she signed purporting to give Thomas authority to act on her behalf does not verify or attest to the contents of the amended complaint.

Rule 11(a) of the Federal Rules of Civil Procedure provides, in pertinent part, that "[e]very pleading, written motion, and other paper shall be signed by at least one attorney of record in the attorney's individual name, or, if the party is not represented by an attorney, shall be signed by the party. * * * An unsigned paper shall be stricken unless omission of the signature is corrected promptly after being called to the attention of the attorney or party." The purpose behind the requirement that pro se litigants sign their own pleadings is to ensure that

unrepresented plaintiffs "actually had assented to the filing of the action on their behalf." 5A

Wright & Miller, Federal Practice and Procedure: Civil 2d § 1334 at 54-55 (footnote omitted).

However, in light of the flexibility accorded a *pro se* litigant, see Haines v. Kerner, 404

U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972), it would be inappropriate to dismiss a *pro se*

pleading solely on the basis of a failure to sign, see Dean v. Westchester County P.R.C., 309

F.Supp.2d 587, 596 (S.D.N.Y. 2004); Olsen v. F.D.I.C., No. 91 Civ. 3741, 1995 WL 494017, at

* 6-7 (S.D.N.Y. Aug. 17, 1995), at least without first affording the *pro se* litigant an opportunity

to correct the deficiency. See, e.g. Sherrell v. Leonard, No. 5:98-CV-156, 1998 WL 59458, at *

1 (N.D.N.Y. Feb. 11, 1998).

Since Dianne admittedly signed a statement which purportedly gave Thomas the authority

to act on her behalf, the purpose behind Rule 11(a)'s signing requirement is met. However, 28

U.S.C. § 1654 only allows for two types of representation in federal court: personal or by

counsel. See Eagle Associates v. Bank of Montreal, 926 F.2d 1305, 1308 (2d Cir. 1991)(holding

that section 1654 only allows for two types of representation: "that by an attorney admitted to the

practice of law by a governmental regulatory body and that by a person representing himself.

The statute does not allow for unlicensed laymen to represent anyone else other than

themselves."). Accordingly, notwithstanding the statement purportedly signed by Dianne,

Thomas may not represent her interests in this Court. See, e.g. Machadio v. Apfel, 276 F.3d 103,

106 (2d Cir. 2002)(holding that an individual who is not licensed as an attorney may not appear

on another person's behalf in the other's cause); Pridgen v. Andresen, 113 F.3d 391, 393 (2d Cir.

1997)(holding that a person ordinarily may not appear *pro se* in the cause of another person or

entity). Therefore, **within thirty (30) days from the filing date of this order**, Dianne must file

with this Court an affidavit stating that she has read the amended complaint and the text of Rule 11 of the Federal Rules of Civil Procedure and that, by executing same, she makes all of the representations delineated in Rule 11(b) with respect to the amended complaint, and containing an original signature, or her remaining claims shall be dismissed in their entirety with prejudice and without further order of this Court.

E.     Failure to Comply with Court Rules

1.     Standard of Review

Great American contends that plaintiffs' amended complaint should be dismissed pursuant to Rule 41(b) because it was not filed within the time set forth in the Court's April 18, 2003 order.

Rule 41(b) of the Federal Rules of Civil Procedure provides, in relevant part:

> "For failure of the plaintiff to prosecute or to comply with these rules [The Federal Rules of Civil Procedure] or any order of court, a defendant may move for dismissal of an action * * *."

The Rule 41(b) involuntary dismissal is an important tool to prevent undue delays and avoid docket congestion. U.S. ex rel. Drake v. Norden Systems, Inc., 375 F.3d 248, 250-251 (2d Cir. 2004).

Although *pro se* plaintiffs are accorded special leniency regarding procedural matters, dismissal is warranted in "sufficiently extreme" circumstances. LeSane v. Hall's Sec. Analyst, Inc., 239 F.3d 206, 209 (2d Cir. 2001). The factors to be considered when determining a motion to dismiss pursuant to Rule 41(b) are: (1) the duration of plaintiff's failures or delay; (2) whether the plaintiff received notice that dismissal may result from his or her inactivity or

76

noncompliance; (3) the prejudice to the defendant arising from plaintiff's action or inaction; (4) whether due process considerations have been balanced against the court's interest in managing its docket; and (5) whether lesser sanctions are more appropriate. See, LeSane, 239 F.3d at 209; Baffa v. Donaldson, Lufkin & Jennette Securities Corp., 222 F.3d 52, 62-63 (2d Cir. 2000). No one factor is dispositive. Drake, 375 F.3d at 254; see also Feurtado v. City of New York, 225 F.R.D. 474, 477-478 (S.D.N.Y. 2004). Dismissal pursuant to Rule 41(b) is committed to the sound discretion of the trial court, Lediju v. New York City Dept. of Sanitation, 173 F.R.D. 105, 110 (S.D.N.Y. 1997), although it is a harsh remedy reserved for only the most extreme circumstances. Lopez v. Catholic Charities of the Archdiocese of New York, No. 00 Civ. 1247, 2001 WL 50896, at * 3 (S.D.N.Y. Jan 22, 2001).

As plaintiffs filed the amended complaint only one day after the deadline imposed by the Court's April 18, 2003 order, and Great American has not demonstrated any prejudice resulting from such a short delay, dismissal pursuant to Rule 41(b) is inappropriate. Accordingly, this branch of Great American's motion is denied.

a. Fed. R. Civ. P. 8[35]

Grand Am and Great American move to dismiss the complaint with prejudice pursuant to, *inter alia*, Rule 8 of the Federal Rules of Civil Procedure.

---

[35] Like Rule 9(b), by its terms, Rule 8 does not explicitly provide for a dismissal motion. Rather, I will construe Grand Am's and Great American's motions to dismiss for failing to comply with the short and plain requirement of Rule 8 as motions to dismiss pursuant to Rule 41(b), which authorizes dismissal where plaintiffs have failed to comply with the Federal Rules of Civil Procedure. See, e.g. Wynder v. McMahon, 360 F.3d 73, 77-78 (2d Cir. 2004)(holding that Rule 41[b] clearly authorizes dismissal where plaintiffs have failed to comply with the Federal Rules of Civil Procedure, including Rule 8).

Rule 8(a)(2) provides, in relevant part, that a complaint "shall contain * * * a short and plain statement of the claim showing that the [plaintiff] is entitled to relief." Rule 8(e)(1) provides, in relevant part, that "[e]ach averment of a pleading shall be simple, concise, and direct." The Second Circuit has observed that:

> The statement should be plain because the principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial. * * * The statement should be short because unnecessary prolixity in a pleading places an unjustified burden on the court and the party who must respond to it because they are forced to select the relevant material from a mass of verbiage.

Salahuddin v. Cuomo, 861 F.2d 40, 42 (2d Cir. 1988)(internal quotations and citations omitted); see also Wynder v. McMahon, 360 F.3d 73, 79 (2d Cir. 2004)(holding that the key to Rule 8[a]'s requirements is whether adequate notice-- i.e. notice that will enable the defendant to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so that it may be assigned the proper form of trial--is given).

"When a complaint does not comply with the requirement that it be short and plain, the court has the power, on its own initiative or in response to a motion by the defendant, to strike any portions that are redundant or immaterial, * * *, or to dismiss the complaint. Dismissal, however, is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." Salahuddin, 861 F.2d at 42 (citations omitted). Although *pro se* plaintiffs are held to a less rigorous pleading standard, dismissal of a *pro se* plaintiff's complaint for failure to comply with Rule 8(a)(2) may still be appropriate. See Jones v. National Communication and Surveillance Networks, 409 F.Supp.2d 456, 464-465 (S.D.N.Y. 2006); Iwachiw v. General Elec. Corp., No. CV 99-3668,

2000 WL 381977, at * 3 (E.D.N.Y. Feb. 22, 2000), aff'd, 10 Fed.Appx. 37 (2d Cir. 2001).

Although plaintiffs amended complaint is unnecessarily lengthy and verbose and borders on being "confused, ambiguous, vague, [and] otherwise unintelligible," distinct claims are discernable upon careful reading and the remaining defendants will be able to adequately defend against the remaining claims and to prepare for the trial of this matter. Therefore, and considering plaintiffs' *pro se* status, I decline to dismiss the amended complaint as being in violation of Rule 8(a).

F.     Summary Judgment

1.     Standard of Review

Republic Western moves, *inter alia* for summary judgment dismissing the complaint. Summary judgment should not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material "if it might affect the outcome of the suit under the governing law." Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001). An issue of fact is genuine only if a jury could reasonably find in favor of the non-moving party based on that fact. See id. The moving party bears the initial burden of establishing the absence of any genuine issue of material fact, after which the burden shifts to the nonmoving party to establish the existence of a factual question that must be resolved at trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The trial court is required to construe the evidence in the light most favorable to the nonmoving party, and draw all reasonable

79

inferences in its favor. See Id. at 252, 106 S.Ct. 2505; Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir. 1996).

2.      Claims against Republic Western

a.      Res Judicata

Republic Western contends that the claims against it are barred under the doctrine of res judicata because the allegations against it in this action are identical to the allegations plaintiffs asserted against it in the 2000 action against it, which was settled and discontinued with prejudice. Moreover, Republic Western contends that to the extent the claims against it in this action are not identical to the prior action, they could have been raised in that prior action and, thus, are barred under the doctrine of res judicata.

Under the doctrine of res judicata, or claim preclusion, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Allen v. McCurry, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980); see Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286-287 (2d Cir. 2002). To establish the affirmative defense of res judicata, the defendant must show (1) that the prior action involved an adjudication on the merits; (2) that the prior action involved the same plaintiffs or those in privity with them; and (3) that the claims asserted in the subsequent action were, or could have been, raised in the previous action. Monahan v. New York City Dept. of Corrections, 214 F.3d 275, 285 (2d Cir. 2000).

For purposes of res judicata, a dismissal, with prejudice, arising out of a settlement agreement operates as a final judgment. Marvel, 310 F.3d at 287; Boguslavsky v. South

80

<u>Richmond Securities, Inc.</u>, 225 F.3d 127, 130 (2d Cir. 2000). Thus, the settlement and court-ordered stipulation of dismissal with prejudice of the 2000 action constitutes a final judgment for res judicata purposes. Moreover, there is clearly an identity of parties between the two actions with respect to plaintiffs' claims against Republic Western. Accordingly, the determination of whether res judicata bars plaintiffs claims against Republic Western depends upon whether their claims were, or could have been, raised in the prior action.

"Whether a claim that was not raised in the previous action could have been raised therein depends *in part* on whether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first. * * * Also dispositive to a finding of preclusive effect, is whether an independent judgment in a separate proceeding would impair or destroy rights or interests established by the judgment entered in the first action." <u>Marvel</u>, 310 F.3d at 287 (internal quotations and citations omitted) (emphasis in original). The determination of whether two actions arise from the same transaction or claim involves consideration of "whether the underlying facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." <u>Id.</u> (internal quotations and citation omitted). A prior judgment does not have preclusive effect where the claims in the subsequent action did not even exist at the time of the prior action or where the court in the prior action could not have awarded the relief requested in the new action. <u>Id.</u>

In the prior action, plaintiffs sued (1) for the value of certain motor homes that were insured by Republic Western and that sustained losses between September 1997 and November

1998, and for which Republic Western allegedly failed to provide coverage, and (2) for lost business. Plaintiffs' allegations in this action are that the same motor homes were insured by Republic Western and that it failed to provide coverage for the same three losses that occurred between September 1997 and November 1998. Accordingly, plaintiffs claims in this action were, or could have been, raised in the previous action.

Although the preclusive effect of a prior settlement may be avoided upon a showing that it was procured by duress or fraud, see F.T.C. v. AMREP Corp., 705 F.Supp. 119, 124 (S.D.N.Y. 1988); see also Yeadon v. New York City Transit Authority, 719 F.Supp. 204, 211 (S.D.N.Y. 1989)(holding that if a settlement is procured through fraud, it will not serve as a defense to subsequent actions), as noted in Part C(6)(a), supra, plaintiffs fail to state a claim for fraud as against Republic Western. Accordingly, plaintiffs' claims against Republic Western are barred by the doctrine of res judicata and the amended complaint is, therefore, dismissed in its entirety as against Republic Western.[36]

G.    Pendent State Law Claims

The State defendants and Grubb & Ellis, among others, contend that this Court should decline to exercise jurisdiction over any pendent state law claims asserted by plaintiffs.

Absent diversity of citizenship between the parties, jurisdiction over a plaintiff's state and local law claims is supplemental. See, 28 U.S.C. § 1367(c)(3); Valencia ex rel. Franco v. Lee, 316 F.3d 299, 304 (2d Cir. 2003). Pursuant to 28 U.S.C. § 1367(c), a court's decision to decline

---

[36] In light of this determination, it is unnecessary to consider Republic Western's remaining contentions regarding dismissal of plaintiffs' claims against it.

to exercise supplemental jurisdiction over a pendent claim is permissive, not mandatory. See, Valencia, 316 F.3d at 305; see also United Mine Workers of America v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)(stating that pendent jurisdiction is a doctrine of discretion). The court must "consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction" over the pendent claims. Carnegie-Mellon University v. Cohill, 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988); see also Raucci v. Town of Rotterdam, 902 F.2d 1050, 1054 (2d Cir. 1990).

While the dismissal of state law claims is not always required when the federal claims in an action are dismissed, see Wisconsin Dept. of Corrections v. Schacht, 524 U.S. 381, 391-92, 118 S.Ct. 2047, 141 L.Ed.2d 364 (1998); Mauro v. Southern New England Telecommunications, Inc., 208 F.3d 384, 388 (2d Cir. 2000), a district court should decline to exercise supplemental jurisdiction if all federal claims have been dismissed at the pleadings stage, Denney v. Deutsche Bank AG, 443 F.3d 253, 266-267 (2d Cir. 2006); Lerner v. Fleet Bank, N.A., 318 F.3d 113, 130 (2d Cir. 2003); see also 28 U.S.C. 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction * * * if – the district court has dismissed all claims over which it has original jurisdiction.").

Since all federal law claims against the State defendants are dismissed, I decline to exercise supplemental jurisdiction over any state law claims against those defendants. Accordingly, plaintiffs' amended complaint is dismissed in its entirety as against the State defendants.

However, since federal claims remain against, *inter alia*, Grubb & Ellis, this Court retains

83

jurisdiction over the pendent state law claims against that defendant. Accordingly, the branch of Grubb & Ellis's motion which seeks dismissal of the state law claims against it on this basis is denied.

### H.    Plaintiffs' Application

Plaintiffs allege that since the filing of this action, they have repeatedly requested injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure without decision.

In order to obtain a prohibitory preliminary injunction, which seeks only to maintain the status quo pending a trial on the merits, a plaintiff must establish (1) that there is a likelihood of irreparable injury in the absence of an injunction; and (2) either that there is a likelihood of success on the merits, or that there are "sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly" in the plaintiff's favor. Malletier v. Burlington Coat Factory Warehouse Corp., 426 F.3d 532, 537 (2d Cir. 2005)(internal quotations and citation omitted). In order to obtain a mandatory preliminary injunction, which seeks to alter the status quo by commanding some positive act, a plaintiff must establish irreparable harm and a clear or substantial likelihood of success on the merits. Mastrovincenzo v. City of New York, 435 F.3d 78, 89 (2d Cir. 2006); Nicholson v. Scoppetta, 344 F.3d 154, 165 (2d Cir. 2003). Injunctive relief "is an extraordinary and drastic remedy" which should only be granted if the plaintiff "by a clear showing, carries the burden of persuasion." Moore v. Consolidated Edison Co. of New York, Inc., 409 F.3d 506, 510 (2d Cir. 2005). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." Id. at 510-511.

Plaintiffs currently seek only mandatory injunctive relief, i.e. the reactivation of their company. However, plaintiffs have not made a clear showing that there is a likelihood of irreparable injury to them in the absence of a preliminary injunction since any injury claimed would be fully compensable by money damages. Plaintiffs themselves concede as much, admitting that a second hearing to reactivate their business, part of their claim for a mandatory injunction, would be useless, and that any decision by this Court on their claims would result in monetary sanctions only. ("Plaintiff's [sic] Answer to ALL Agency and Non-Agency Motions to Dismiss" [Plf. Opp.], p. 12). Moreover, to the extent plaintiffs claim the potential for emotional and physical harm as well as financial loss absent an injunction, their claims are too remote and speculative to warrant injunctive relief. See, e.g. Moore, 409 F.3d at 511 (affirming the district court's conclusion that the claim of psychological harms was too speculative to warrant preliminary relief).

In addition, although some of plaintiffs' claims survive certain of the defendants' motions to dismiss, plaintiffs have not made a clear showing of a "clear or substantial" likelihood of merits necessary to establish a claim for mandatory injunctive relief, particularly since, as noted in part A(3), supra, this Court lacks subject matter jurisdiction over plaintiffs' claims regarding the dissolution of their company for the nonpayment of taxes.

To the extent plaintiffs also seek a prohibitory preliminary injunction, they have not made a clear showing of a likelihood of merits on any of their claims, or of sufficiently serious questions and a balance of hardships in their favor.

Moreover, an evidentiary hearing is not required where, as here, the relevant facts are either not in dispute or the disputed facts are amenable to complete resolution on a paper record.

Charette v. Town of Oyster Bay, 159 F.3d 749, 755 (2d Cir. 1998); Cooney v. Consolidated Edison Co. of New York, Inc., No. 03 Civ. 0869, 2003 WL 22093483, at * 2 (S.D.N.Y. Sept. 10, 2003). Since the papers before me clearly demonstrate the lack of a right to injunctive relief, rendering any further evidence meaningless, any outstanding applications for injunctive relief and for a hearing are denied.


CONCLUSION

For the reasons set forth herein, (1) the motions to dismiss by the State defendants, the Town of Brookhaven and Grucci, Kanas, North Fork, MBA, Verizon, AT&T, Grand Am, Great American, the Teamsters defendants and the FBI defendants are granted to the extent set forth herein and the amended complaint is dismissed in its entirety with prejudice as against those defendants, and the motions are otherwise denied; (2) the Twomey Latham defendants' motion to dismiss is granted to the extent that plaintiffs' section 1983 claims, except their conspiracy claim, against them are dismissed with prejudice, and the motion is otherwise denied; (3) Fleetwood Credit's motion to dismiss is granted to the extent that the section 1983 claims against it are dismissed in their entirety with prejudice, and the motion is otherwise denied; (4) Grubb & Ellis's motion for judgment on the pleadings is granted to the extent that plaintiffs' conversion claims, TILA claims, FDCPA claims and FCRA claims are dismissed as time barred and the section 1983 claims, except the conspiracy claims, and the misappropriation claims are dismissed for failure to state a cause of action, and the motion is otherwise denied; (5) O'Connor's motion to dismiss is granted to the extent that the conversion claims against him are dismissed as time barred and the section 1983 claims, except the conspiracy claims, are dismissed for failure to

86

state a cause of action, and the motion is otherwise denied; (6) Republic Western's motion for summary judgment is granted to the extent set forth herein and the amended complaint is dismissed in its entirety with prejudice as against Republic Western, and the motion is otherwise denied; (7) the Town of Riverhead's motion to dismiss is granted to the extent that the misappropriation and conversion claims against it, the Riverhead Community Development Agency, Bowman, Lohneise, Villella and Stark are dismissed with prejudice, and the motion is otherwise denied; (8) plaintiffs' claims alleging violations of 18 U.S.C., Chapter I, §§ 2, 3 and 4, the Privacy Act of 1974, the "Corrupt Practices Act," the Truth in Lending Act, the Fair Debt Collection Practices Act, and the Freedom of Information Act are dismissed sua sponte in their entirety with prejudice; (9) plaintiffs' first cause of action is dismissed sua sponte with prejudice as against the Suffolk County District Attorney, the SCPD Fifth Precinct, Jones, Gardner and Calabrese; (10) plaintiffs' claims against the Suffolk County Sheriff's Department, the Suffolk County Clerk Edward Romaine, the Suffolk County Police Internal Affairs Division, the Suffolk County Police Department, Third Precinct, the Suffolk County Legislature, the Suffolk County Department of Consumer Affairs, Suffolk County Executive Roberty Gaffney, the Town of Riverhead Town Council, the Town of Riverhead Town Supervisor, Key Bank, the Langdons, Specialized Insurance and Wrenn Insurance are dismissed in their entirety sua sponte with prejudice; (11) plaintiffs' claim relating to the filing of their mechanic's lien is dismissed sua sponte with prejudice as against the County of Suffolk; (12) plaintiffs' section 1983 claims against Complete RV, Tag Motors, Great American, Gomes, Rossi, Jones and Safari Motor Coach are dismissed in their entirety sua sponte with prejudice; (13) plaintiffs' section 1983 claims, with the exception of their conspiracy claims, and their misappropriation of property and

conversion claims against Island Realty, First Industrial, Cohen and Burman are dismissed <u>sua</u> <u>sponte</u> with prejudice; (14) plaintiffs' first cause of action against Tag Motors is dismissed <u>sua</u> <u>sponte</u> with prejudice[37]; (15) plaintiffs' third cause of action is dismissed <u>sua</u> <u>sponte</u> as against the SCPD Fifth Precinct with prejudice; and (16) plaintiffs' intentional tort claims relating to conduct occurring prior to November 1, 2001, including their intentional tort claims against John Langdon and Jones, are dismissed <u>sua</u> <u>sponte</u> with prejudice.[38]  The remaining parties are directed to appear in my courtroom **at 1010 Federal Plaza, Central Islip, New York, on July 27 at 12:00 p.m.** for a settlement and/or scheduling conference with authority, or persons with authority, to resolve this action. The parties are directed to engage in good faith settlement negotiations prior to the conference.

SO ORDERED.

_____
SANDRA J. FEUERSTEIN
United States District Judge

Dated: June 26 , 2006

---

[37]  Accordingly, plaintiffs' first cause of action is dismissed in its entirety with prejudice.

[38]  For the sake of clarity, the following claims remain: (1) plaintiffs' claims against the County of Suffolk, with the exception of their claims relating to the filing of a mechanic's lien against the Grumman property; (2) plaintiffs' claims against the Suffolk County District Attorney, with the exception of their first cause of action and their section 1983 claim based on a failure to investigate; (3) plaintiffs' claims against the SCPD Fifth Precinct and Detectives Calabrese and Gardner, with the exception of their section 1983 claims based on a failure to investigate; (5) plaintiffs' section 1983 conspiracy claims and fraud claims against the Twomey Latham defendants, Grubb & Ellis, O'Connor, the Town of Riverhead, the Town of Riverhead Community Development Agency, Bowman, Lohneise, Villella, Stark, O'Connor, Island Shore Realty, First Industrial, Burman and Cohen; (6) the fraud claims against Complete RV, Tag Motors, Grand Am, Great American, Fleetwood Credit, Gomes, Rossi and Jones; and (7) plaintiffs' claims against Safari Motor Coach, with the exception of their section 1983 claims. The caption of this action shall be amended to include only the remaining defendants.

88

Copies to:

Thomas Longi, pro se
6 Cedarwood Drive
Shirley, New York 11967

Dianne Longi, pro se
6 Cedarwood Drive
Shirley, New York 11967

New York State Attorney General's Office
200 Old Country Road, Suite 460
Mineola, New York 11501
Attn:   Toni E. Logue, AAG

Suffolk County Attorney's Office
P.O. Box 6100
H. Lee Dennison Building, Fifth Floor
100 Veterans Memorial Highway
Hauppauge, New York 11788-0099
Attn:   Arlene S. Zwilling, Esq.

Kral, Clerkin, Redmond, Ryan,
Perry & Girvan, LLP
69 East Jericho Turnpike
Mineola, New York 11501
Attn:   Thaddeus John Rozanski, Esq.

Mazzei & Blair
98 Montauk Highway
Blue Point, New York 11715
Attn:   Patricia Byrne Blair, Esq.

Willaim Alan Kowalensko, P.C.
One South Ocean Avenue, Suite 200
Patchogue, New York 11772

The Law Office of Vincent D. McNamara
1045 Oyster Bay Road
East Norwich, New York 11732
Attn:   Anthony Marino, Esq.

Thomas M. Bona, Esq.
123 Main Street

White Plains, New York 10601

The Law Office of David J. Tetlak
1600 Stewart Avenue, Suite 210
Westbury, New York 11590

Berkman, Henoch, Peterson & Peddy, P.C.
100 Garden City Plaza
Garden City, New York 11530
Attn:   Cara M. Goldstein, Esq.
        Ronald M. Terenzi, Esq.

Maimone & Associates, PLLC
170 Old Country Road, Suite 502
Mineola, New York 11501
Attn:   Lance Perez, Esq.

Carol R. Abramson, Esq.
1095 Avenue of the Americas
New York, New York 10036

Montfort Healy McGuire & Salley
1140 Franklin Avenue
Garden City, New York 11530
Attn:   Michael Baranowitz, Esq.

Lynch Rowin LLP
630 Third Avenue
New York, New York 10017
Attn:   Marc Rowin, Esq.

Friedman & Wolf
1500 Broadway, Suite 2300
New York, New York 10036
Attn:   Nathan V. Bishop, Esq.

Schindel Farman & Lipsius
14 Penn Plaza, Suite 500
New York, New York 10122
Attn:   Betty Pincus Balcomb, Esq.
        Ira S. Lipsius, Esq.

United States Attorney's Office
Eastern District of New York

610 Federal Plaza
Central Islip, New York 11722
Attn: Kevin Patrick Mulry, AUSA

Teitelbaum, Braverman & Borges, P.C.
3333 New Hyde Park Road, Suite 305
New Hyde Park, New York 11042
Attn: Wanda Borges, Esq.

William J. Candee, IV
300 Park Avenuem Suite 1700
New York, New York 10022

Balfe & Holland, PC
One Huntington Quadrangle, Suite 3S09
Melville, New York 11747
Attn: Kevin E. Balfe

New York State Attorney General's Office
300 Motor Parkway, Suite 205
Hauppauge, New York 11788
Attn: Susan M. Connolly, AAG